[Civil No. 159.   Filed June 1, 1886.]

[S. C. 11 Pac. 110.]

WASHINGTON M. JACOBS, Plaintiff and Respondent, v. J. M. GEORGE et al., Defendants and Appellants.

1. PRINCIPAL AND AGENT—AGENT CONTRACTING WITH RESPECT TO

MATTER OF AGENCY FOR INDIVIDUAL BENEFIT—ACTING AS AGENT FOR BOTH PARTIES—WHERE CONTRACT IS ENTERED INTO FOR FRAUDULENT PURPOSE EQUITY WILL REFUSE ALL PARTIES AFFIRMATIVE RELIEF.—Where an agent for the sale of a mine makes a contract with respect thereto for his individual benefit, and further attempts to represent both parties to the transaction, in an action to enforce such contract a court of equity will refuse relief and will leave the parties in the position in which it finds them.

OPINION ON SECOND APPEAL, 3 Ariz., 20 Pac. 183.

APPEAL from a judgment of the County Court in and for the County of Pima. Reversed.

The facts are stated in the opinion.

Hoover & Satterwhite, for Appellants.

Haynes & Styles, for Respondent.

PORTER, J.—The plaintiff was an assayer in Tucson, and one of defendants, Morgan, was a mining agent, residing in the same town. Morgan was at Jacobs' assay office, and met there one Manual Sanchez, who had specimens of ore. Sanchez could not talk English very well, and Jacobs acted as interpreter. Sanchez wanted Morgan to buy the mine. Thereafter Jacobs represented to him the richness of the mine, and desired to sell it to Morgan. He (Morgan) had the ores tested by defendant Hiertz, and then wrote to defendant George, and then they all agreed to purchase the San Recardo mine if satisfactory. Accordingly Morgan and Jacobs, on May 8, 1883, entered into a written agreement in which Morgan was to examine the mine, and, if it suited, was first to take a bond, and thereafter, on further testing the ores, agreed to purchase the same for $5,000, payable in installments therein mentioned; and said Jacobs, on his part, stipulated as follows: "I agree to use by best endeavors to secure the property above described upon the terms specified." Defendants' Exhibit A. Jacobs said, "If you people buy it for that, I want to have a quarter of it;" and further, "I will send for him, (Sanchez.) Don't tell him of the quarter I want of the mine." These remarks of

Jacobs were testified to by Morgan, and nowhere in the transcript were they denied.

On the tenth of May, plaintiff's Exhibit D was made, whereby Manual Sanchez and W. M. Jacobs, of the first part, agreed to sell to parties of the second part, J. M. George, J. J. Hiertz and J. S. Morgan, the St. Richard mine, formerly known as the "Santa Christo Mine," in the state of Sonora, Mexico, for $5,000, in installments therein set forth; and the parties of the second part agreed to make the specified payments, and to pay all expenses in going to Sonora and returning, "whether the property shall be found satisfactory or not." George and Hiertz then went to the mine with Sanchez and came back satisfied. The final contract of sale was executed by Sanchez and his associates in Mexico.

On May 10, 1883, Exhibit C of plaintiff was made, in which George, Hiertz and Morgan, parties of the first part, agreed with Jacobs, of the second part, that in case the purchase was consummated they would deed to him, "as commission for the sale and purchase of the mine, one-quarter of it;" and further: "The party of the second part agrees, for and in consideration of said one-quarter of said mine, to give to the party of the first part the refusal and first option to purchase said one-quarter of said mine whenever the said party of the second part shall conclude to bargain for or sell his said quarter of said mine. It is also further agreed by each of the parties herein named that either the party of the first part, or the party of the second part, shall have the right to erect and establish such reduction works upon or near said mine as they may deem fit, at their own expense, and develop said mine in such manner as in their judgment may seem to them best for their individual interest, without interference or hinderance by the other party of the second part. It is further agreed that the parties of the first part are to have and receive all the profits arising from the development of said mine, and the reduction of ores they may take from said property, until the party of the second shall have disposed of said one-quarter of said mine."

About November 24, 1883, the purchase was completed by the conveyance from Sanchez to the grantees. Subsequently to said purchase said grantees sold the three-fourths of the

mine to the Recardo Mining Company, a company organized and acting under the laws of the territory of Arizona, of which organization the individual defendants form a part. About the time of the last payment Sanchez notified individual defendants that he claimed a one-quarter interest which they had agreed to deed to plaintiff; and on the twenty-fourth of November, 1883, the defendants paid Sanchez $1,250 for said interest, and took a deed therefor.

Plaintiff alleges in his complaint ''that the denouncement and other legal documents pertaining to the title of the mine were in the name and in the possession of Manual Sanchez,'' and at the same time plaintiff had from said Sanchez lawful authority to sell said mining location for the sum of $3,000, and was endeavoring to sell said mining claim for the benefit of himself and said Sanchez. This allegation is founded upon two instruments in writing, the first of which is alleged to have been made October 11, 1881, whereby Sanchez covenants to make over to plaintiff, the assayer, the third part in some, and the fourth part in others, which he possessed, or might thereafter possess, either alone or in company with others; the consideration thereof being for assaying the ores of the mines, without further compensation; each party binding himself to act in accordance with the laws of the country where the mines are situated. Sanchez was an ignorant man, and could neither read nor write. His mark is attached thereto, the name of Jacobs signed, and witnesses were J. M. Silva and H. N. Smith. The trial judge, on inspection of the document, declared all of it to be a tracing, except the signatures Jacobs and Smith. The plaintiff wavers and is uncertain as to whether the contract was signed in ink or in pencil. Neither does the witness Smith remember whether it was in pencil or in ink. It was certainly traced. Then comes another contract between plaintiff and Sanchez, (plaintiff's Exhibit B,) under date of twenty-sixth of January, 1883, which plaintiff found . necessary to have in order to effectuate the contemplated sale. In this document authority was given Jacobs, who was recognized therein as a ''partner,'' to sell, contract or bond certain mines for sums specified therein, among which is the one in question, which was to be sold for $3,000; and

therein it is stated that one-quarter thereof belonged to Jacobs. Plaintiff says he saw Sanchez sign it. When asked, "Was there others present at the time?" he answered, "My wife wrote it at my dictation." It shows signature by mark, with witnesses Mark Tully and Frank R. Bettis.

Passing by the due execution of said instruments, and whether or not valid by the laws of Mexico where there is an executory contract performed on one side, we will view their effect upon this transaction. Says plaintiff: "Having such a contract in my possession, and having arrived from Sonora with ores, I went into Mr. Morgan's office, and he commenced talking to me about taking third parties going down. I told him: 'You may believe what you please; but here are the assays I have made; and, if you don't believe that I have made them, right there is Mr. Hiertz, who is an assayer. I will give him the use of my office,' etc. I told them that they should give five thousand dollars for the mine, and that they should give me one-fourth interest for commission. After they agreed to that, they wanted a little further proposition. They wanted to have me use my influence with Sanchez to take the money in installments. I said: 'I suppose if you will pay one thousand dollars in cash, and the rest in installments, he will be agreeable.' So they drew that agreement in pencil, and I signed it, and George signed it, and Morgan signed; then put the document in their desk, and promised to give me a copy of it next day, but they never gave it to me before the day following."

It seems that a more formal document was contemplated, which, being made, plaintiff was not satisfied with, and held onto this one. Defendants insist that there was no delivery, as another one was to be the governing agreement; but we think this was sufficient delivery of their contract with Jacobs, and will take it as being valid under the laws of Mexico. If Jacobs was their agent, and performed their service, and acted in good faith, that is all that was required of him under their contract with him.

The individual defendants, while recognizing Jacobs as agent of Sanchez, yet use him as their own agent, and so declare in their testimony. They say that Jacobs represented himself as agent of Sanchez. This Jacobs denies on re-exam-

ination; and yet on his cross-examination he says, "having possessed himself of the contract, which contract was authority from Sanchez to sell, I went into Morgan's office;" and there they commenced the negotiations. But we will concede explicit denial, and no review therefor to be had on the verbal contradictions. The payment of the $5,000 is made, and Jacobs gets one-fourth of the same, claiming by virtue of his agreement with Sanchez that he was the equitable owner of one-fourth; and yet he, after mature deliberation, signs a receipt to Sanchez, reciting that this one-fourth was commission for selling the mine. From his own stand-point, he, in effect, sells three-fourths of the mine, and keeps his own interest restricted only by giving grantees the refusal to purchase. It is true, Sanchez gets more money than the power called for, but it is equally true that plaintiff received his part of the enhanced price aside from the one-quarter to be deeded back to him. He is reaping a rich harvest.

"It is well settled, and a salutary rule, that 'a person who undertakes to act for another in any matter shall not, in the same matter, act for himself. It is only by a rigid adherence to this simple rule that all temptations can be removed from one acting in a fiduciary capacity to abuse his trust, or seek his own advantage in the position which it affords him. One consequence of a violation of the rule is that the agent must, at the option of his principal, account to him for any profit he may have made by the transaction. It matters not how fair the conduct of the agent may have been in the particular case, nor that the principal would have been no better off if the agent had strictly executed his power, nor that the principal was not in fact injured by the intervention of the agent for his own benefit. If the agent deals with the subject-matter of his agency, or, by departing from the instructions of his principal, obtains a better result than could have been obtained by following them, the principal can claim the advantage thus obtained, even though the agent may have contributed his own funds or responsibility in producing the result. The rule which places it beyond the power of the agent to profit by such transactions is founded upon considerations of policy, and is intended, not merely to afford a remedy for discovered frauds, but to reach those which

may be conceded; and also to prevent them, by removing from agents and trustees all inducements to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates.'' *Dutton* v. *Willner,* 52 N. Y. 312, and cases therein cited.

Well, suppose that the plaintiff was acting as agent for these defendants, in that case it was his bounden duty to purchase this property at the least possible price. Did he do it? The plaintiff says the consideration which induced the second paper, viz., Exhibit B, was that Sanchez was going to let the property go for $1,000; saying: ''I refused to let him throw away his property in that way, and I told him I would find a party to go down and look after them.'' This paper itself fixed the price of this property at $3,000. He knew Sanchez would sell for that sum, and yet he made these defendants believe he could not obtain it for less than $5,000. The conduct of these individual defendants is most reprehensible. They meet this plaintiff, who, they say, was Sanchez's agent, and by this secret agreement with him obtain the purchase of the property represented, as they say, by plaintiff to be worth $10,000 for $5,000. They in fact employ this man, the agent, friend and interpreter of Sanchez, to get the property as low as possible. The defendant Morgan testified: ''He (Jacobs) soon told me that he was acting for Sanchez in making a sale of this mine, and that he would get a quarter of what Sanchez got for it for selling it.'' This was in January, 1883. The transaction for sale occurred in May. The other defendants say they did not know of Morgan getting part of the money until the second payment was made. It may be that Morgan did not inform his co-purchasers of that fact, which caused them to so testify.

''If a contract has been entered into through fraud, or to accomplish any fraudulent purpose, a court of equity will not, at the suit of one of the fraudulent parties,—*a particeps doli,*— while the agreement is still executory, either compel its execution or decree its cancellation; nor, after it has been executed, set aside, and thus restore the plaintiff to the property or other interests which he had fraudulently transferred. Equity will leave such parties in exactly the position

in which they have placed themselves, refusing all *affirmative* aid to either of the fraudulent participants. The only equitable remedies which they can obtain are purely defensive; and, generally, where two or more have entered into a fraudulent scheme for the purpose of obtaining property in which all are to share, and the scheme has been carried out so that all of the results of the fraud are in the hands of one of the party, a court of equity will not interfere on behalf of the others to aid them in obtaining their share, but will leave the parties in the position where they have placed themselves." 1 Pom. Eq. Jur. 436.

The judgment of the district court is that the individual defendants execute and deliver to the plaintiff a conveyance in proper form to enable him to record the same in the state of Sonora, Mexico, of an individual one-fourth interest of the San Recardo mine; and, in case of their inability to do so, that the other defendants, San Recardo Mining Company," shall execute it. This is to be done without limitation or restriction, whereas it is expressed in the agreement, which agreement is one of the findings of fact, that defendants should have refusal to purchase the one-quarter interest of plaintiff. There would be the record by which plaintiff could sell to any other party without restriction.

We think the court erred in giving judgment for plaintiff. Judgment reversed and a new trial granted.

Shields, C. J., and Barnes, J., concurred.