[Civil No. 235.   Filed January 19, 1889.]

[20 Pac. 183.]

## WASHINGTON M. JACOBS, Plaintiff and Appellee, v. J. M. GEORGE, Defendant and Appellant.

1. PRINCIPAL AND AGENT—UNDISCLOSED DUAL AGENCY—CONTRACT—SPECIFIC PERFORMANCE.—An agent cannot enforce specific performance of a contract for his own benefit respecting the subject-matter of his agency where he has secretly acted for both parties.

BARNES, J., dissenting.

Former opinion, see same case, 2 Ariz. 93.

APPEAL from a judgment of the District Court of the First Judicial District in and for the County of Pima. Reversed.

The facts are stated in the opinion.

Thomas D. Satterwhite, and H. W. Maxwell, for Appellants.

The alleged contract, which forms the basis of this action, even if it was ever executed and delivered to the plaintiff, was fraudulent and void, for the reason that, at the time of the alleged execution thereof, the plaintiff was the retained agent of Manuel Sanchez for the sale of said mine, and was under obligation to him to sell the same for the largest sum he could possibly obtain therefor. Hence any contract which the plaintiff might have entered into with the purchasers of said mine, of the nature or character of said exhibit C, by which he was to receive a commission from the defendants for procuring the sale of said mine to them, would necessarily be fraudulent and void.

Such contracts are universally held to be contrary to public policy, and courts of equity everywhere refuse to enforce them.

The decision of this court, on the former appeal of this case, is conclusive. *Dutton* v. *Milner,* 52 N. Y. 312; *Grumley* v. *Webb,* 44 Mo. 444, 100 Am. Dec. 304; 2 Pomeroy's Equity Jurisprudence, 959; 1 Wait's Actions and Defenses, pp. 246-248, and authorities cited.

Even if the plaintiff was a part owner of said mine with

Sanchez this would not give him any better equitable standing before the court, for the reason that he would then be acting as trustee for said Sanchez in the sale of his three fourths of said mine. Therefore, if he held this fiduciary relation to said Sanchez he would be under the same equitable obligations, and would be required to exercise the same good faith towards him, and would be just as much forbidden to become the agent of the defendants for the purchase of said mine, as if the said Sanchez owned the whole of the said mine. 2 Pomeroy's Equity Jurisprudence, sec. 958, and authorities cited; 1 Wait's Actions and Defenses, pp. 246, 247, and authorities cited.

Even if it was a valid, executed contract, the court erred in decreeing to the plaintiff one sixteenth, or any other part, of said mine, under said contract, for the reason that, if the plaintiff acquired any interest therein, he acquired it by reason of his *trading* and *speculating with his principal's* property. In such a transaction the rule is well settled, that, when an agent thus deals with his principal's property and makes a profit out of the transaction, such profit, and the whole of it, belongs to his principal. 1 Pomeroy's Equity Jurisprudence, sec. 422; 2 Pomeroy's Equity Jurisprudence, secs. 587, 1049, and authorities; *Ferris* v. *Van Vechten,* 73 N. Y. 113; *Stow* v. *Kimball,* 28 Ill. 93; *Reichoff* v. *Brecht,* 51 Iowa 633; *Ringo* v. *Binns,* 10 Pet. 269; Story's Equity Jurisprudence, sec. 1261.

Haynes & Mitchell, for Appellee.

WRIGHT, C. J.—This is the second time this case has been passed upon by this court, having been first decided at the January term, 1886, hereof. 2 Ariz. 93, 11 Pac. Rep. 110. It was stipulated by the attorneys in the case at the last trial that the evidence at the former trial should be considered as given at the new trial, subject to legal objections, etc. The case was tried by the court without the intervention of a jury. The court found for the plaintiff and appellee, whereupon the defendants and appellants duly filed their motion for a new trial; and, it being overruled, they have brought their case here by appeal.

The grounds specified in the motion for a new trial were

that the decision of the court was not justified by the evidence, and that the decision was against the law. The suit was one to enforce the specific performance of a contract, alleged to have been entered into on the tenth day of May, 1883, by and between Jacobs, the appellee, and the appellants, George, Hiertz, and Morgan, by the terms of which, in case they bought the mine, they were to deed back one fourth of it to the said Jacobs as commission for the sale and purchase thereof. The substantial facts, as deduced from the evidence, —at least all the facts we deem necessary for the proper determination of the questions raised by the motion for a new trial,—are as follows: That one Manuel Sanchez, who was a mining prospector both in Arizona and Mexico, was in the habit, during the years 1881 and 1882, and perhaps earlier than that, of taking samples of ore from mines which he had discovered to the appellee, W. M. Jacobs, to make assays of them,—Mr. Jacobs being an assayer in Tucson, Arizona Territory. In this way quite an intimacy seems to have grown up between them. Sanchez was a Mexican, quite ignorant, unable to write his own name, and with practically but little knowledge of the English language. There seems no doubt that Sanchez reposed great confidence in Jacobs. Hiertz, one of the appellants, testifies that, at the time negotiations were pending for the property, Jacobs said: "If you want that property, you keep quiet, and I will procure the owner of the property. You must not interfere with us, as this man [meaning Sanchez] has confidence in me, and I can deal better with him than you can." So that on the twenty-sixth day of January, 1883, Sanchez executed to Jacobs the following written appointment of agency, or power of attorney, to sell the mines of Sanchez:—

"This document is to show that I, Manuel Sanchez, for myself and my partners, give ample power to Don Washington M. Jacobs, whom I recognize as one of my partners, to sell, contract, or bond to whomever may interest themselves for the mines at the prices, to-wit, [here follow names and prices,] the quarter part of which mines belongs to W. M. Jacobs, as the owner of the fourth part of which he represents, so as to enable Mr. Jacobs to contract and guaranty with legality, give this, my signature, obliging me to respect in this

country or Sonora, religiously; and in proof whereof signed this in Tucson, the twenty-sixth day of January, 1883, before whom signed.

                      his
             "MANUEL **X** SANCHEZ.

"Witnesses: MARK TULLY, and        mark.
      "FRANK R. BETTIS."

The mine in question is called the "San Ricardo," and is situated in the Ures District, State of Sonora, Mexico. Some months after the execution of the above power of attorney, Mr. Jacobs returned from a trip to this mine, with some of the ore therefrom, which sampled very rich. Morgan, one of the appellants, was at that time a mining agent in Tucson, and Jacobs exhibited to him the assays of this ore, and gave him the use of his (Jacobs') assay office, for Hiertz, another one of the appellants, to make assays of the ore also; he (Jacobs) agreeing to pay the expense of Hiertz's assay if it did not corroborate his. This assay of Hiertz was satisfactory; and on the eighth day of May, 1883, Morgan, who seems to have been the moneyed man of the individual appellants, entered into the following agreement with Jacobs, viz.:—

"I will go and examine the mine in Sonora at our expense, and, if the mines suit us, will take a bond for six months on the property at $5,000, we to have all the ore we wish to take out of the mine, and have the privilege to do such work on the mines as we think proper, and either work the same by arastras or otherwise during the time pending our bond; or if, after examination of mines, we conclude to purchase, we will pay the owners $1,000 cash after examination, if found satisfactory, and $1,000 in sixty days, and $1,000 in ninety days; balance, $2,000, at expiration of bond. A failure or non-compliance to above will forfeit right to claim, and what is paid.

"Tucson, May the 8th, 1883.        J. S. MORGAN.

"I agree to use my best endeavors to secure the property above described, upon the terms specified.

                        "W. M. JACOBS."

A short time before this contract was executed Mr. Jacobs says Sanchez had told him he would take five thousand dollars for the mine, and no less. Two days after this contract be-

tween Morgan and Jacobs was entered into, Jacobs having sent for Sanchez, a contract for the sale of said mine for the sum of five thousand dollars was entered into by and between the appellee, Jacobs, and Manuel Sanchez, parties of the first part, and the appellants, George, Hiertz, and Morgan, parties of the second part, the terms of sale being identical with those contained in the contract between Jacobs and Morgan. At the same time, but in the absence of Sanchez, and without his knowledge or consent, Jacobs, the appellee and the appellants, George, Hiertz, and Morgan, entered into the following contract, viz.:—

"It is hereby agreed by and between J. M. George, J. J. Hiertz, and J. S. Morgan, parties of the first part, and W. M. Jacobs, party of the second part, as follows, to wit: The parties of the first part agree to proceed to Sonora, and there examine the Saint Ricardo Mine, and, if found on examination to be satisfactory, to pay for said property as provided for and specified in certain contract of May 10, 1883, made by the above-named parties and one Manuel Sanchez; and, in case said property shall be purchased by the said J. M. George, J. J. Hiertz, and J. S. Morgan, they each of them mutually agree to deed to the said W. M. Jacobs, as commissions for the sale and purchase of said mine, free of any and all expense to him, one quarter of said mine, for him to have, hold, or transfer at option, without expenses of taxes or assessment work, or other expense whatever. The party of the second part agrees, that for and in consideration of said one quarter of said mine, to give to the party of the first part the refusal and first option to purchase said one quarter of said mine whenever the said party of the second part shall conclude to bargain for, or sell, his said quarter of said mine. It is also further agreed by each of the parties herein named that either the party of the first part or the party of the second part shall have the right to erect and establish such reduction works upon or near said mine as they see fit, at their own expense, and develop said mine in such manner as in their judgment may seem to them best for their individual interests, without interference or hindrance by the other party of the second part. It is further agreed that the party of the first part are to have and receive all the profits arising from the

development of said mine, and the reduction of ores they may take from said property, until the party of the second part shall have disposed of said one quarter of said mine.

"Tucson, May 10th, 1883.                         J. M. GEORGE.

                                                "J.  J.  HIERTZ.

                                                "J.  S.  MORGAN.

                                                "W.  M.  JACOBS."

Jacobs had demanded this one quarter of said mine at the time he first told the vendees he could probably get the mine for them for five thousand dollars; it being in evidence that he told them also that it was worth ten thousand dollars. He told them they should give it to him as commission, but not to let Sanchez know anything about it. Sanchez did not know anything about it until quite a while after the trade was made. Then he told the parties that Jacobs had acted false with him, and had kept an interest for himself; and he demanded that appellants should pay him, and not Jacobs, for this one fourth interest. After some time appellants paid Sanchez twelve hundred and fifty dollars for the one-quarter interest in the mine, and took his deed therefor. Sanchez paid Jacobs one fourth of the original purchase money, the five thousand dollars, as the installments were paid. At the time the last payment or installment of the five thousand dollars was made, Jacobs executed to Sanchez the following receipt:—

                                "TUCSON, November 24, 1883.

"I received from Manuel Sanchez the sum of one thousand two hundred and fifty dollars, as part of the commission of the five thousand dollars which he received from J. M. George, J. J. Hiértz, and J. S. Morgan, for the sale on the contract of the mine San Ricardo, situated in the district of Ures, in Sonora, Mexico.          [Signed]    WASHINGTON M. JACOBS.

"Witness: SANTIAGO AINSA."

The court decreed a specific performance of the contract sued on, to the extent of requiring the appellants to deed to Jacobs, the appellee, one fourth of one fourth, or one sixteenth, of said mine, and the question for us to determine is, was that finding under the law and the evidence correct? After a careful and deliberate consideration of this case we

have been unable to arrive at the same conclusion arrived at
by the learned judge who tried it below. Is it not true that
Jacobs was Sanchez's agent in the sale of the mining property
in question to the appellants, George, Hiertz, and Morgan?
The testimony of each of these appellants, the testimony of
Ainsa, the power of attorney from Sanchez to Jacobs, the
contract between Jacobs and Morgan, the contract of sale
between Sanchez and Jacobs as parties of the first part, and
George, Hiertz, and Morgan, the parties of the second part,
and even the testimony and conduct of Mr. Jacobs himself,
all shows that he was. Indeed, their relations were fiduciary;
and Sanchez was entitled to the utmost good faith, and the
fullest disclosure from Jacobs. True, Mr. Jacobs in his testi-
mony, makes the following statement, upon which we must put
the most charitable construction: "I had no hand whatever
in the negotiation of this sale. I simply brought the parties
together, and they made their own trade." If this were
true, what right had he to call on the appellants to deed him
a quarter interest in the mine? What consideration did they
get for agreeing to do so? He either had or had not some-
thing to do with the sale. If he had nothing to do with it,
then the contract by which he was to have one fourth of the
mine deeded back to him was void for want of consideration.
If he had nothing for them,—if he "had no hand whatever in
the negotiation,"—what obligations were they under to him?
But Mr. Jacobs contradicts himself, and shows that he did
have something to do with the negotiation of the sale. In his
redirect examination he says: "Hiertz made the assays, and
they were so satisfactory that the parties came to my office
the next day, and made arrangements with me about the pur-
chase of the mine. I told them that they should give five
thousand dollars for the mine, and that they should give me
one-fourth interest for commission. After they had agreed to
do this, they wanted me to use my influence with Sanchez to
take the money in installments. I said, 'I suppose if you will
pay about one thousand dollars in cash, and the rest in install-
ments, he will be agreeable.' " Was not this substantially
the trade that was eventually agreed upon? If so, who nego-
tiated it? The truth is, Jacobs had a great deal to do with
negotiating this sale; in fact, almost everything, especially

on the part of the vendors. Sanchez had generously made him a partner to the extent of one-fourth interest; had given him full written authority to sell the mine; and trusted him with that simplicity of confidence which the ignorant and inferior give to their superiors and those upon whom they rely; for he adopted the final contract of sale literally as Jacobs had originally negotiated it. Jacobs occupied a peculiarly sacred relation to Sanchez; he was his partner and confidential adviser; and equity will not permit Jacobs to avail himself of any advantage or contract which his position may have enabled him to obtain, to speculate or reap advantage off his principal. Sanchez was an unlettered Mexican. He could speak but little English, and could not write his own name. He had given to Jacobs his full confidence and "ample power to contract, sell, or bond" the mine. There was due, therefore, from Jacobs to him, the utmost good faith and rectitude of conduct; the fullest measure of skill, energy, and ability. The paramount duty devolved upon the agent to subserve the interests of his principal.

Beyond peradventure the evidence shows that in the highest sense of the term Jacobs was Sanchez's agent in this sale. If so, could he also represent the appellants, George, Hiertz, and Morgan, without revealing fully to Sanchez, on the one hand, and to appellants on the other, his full relations to each? Did he reveal to Sanchez that he was to have one fourth of the mine deeded back to him by George, Hiertz, and Morgan as commission? Did he tell the latter, before he negotiated the sale with them, that he was a quarter owner of the mine with Sanchez, and that Sanchez had given this quarter to him? If, however, he had revealed his true relations to the one, and not to the other also, would that have helped the matter any? The fact is incontrovertible that Jacobs not only did not reveal to Sanchez the important fact that by the terms of his contract with said appellants they were to deed back to him one fourth of the mine, but he repeatedly enjoined upon them not to inform Sanchez. If he was acting in good faith, why this injunction of secrecy? Will he be heard to say he had nothing to do with the negotiation of this sale, when the evidence shows that he did about all that was done on the part of the vendors? Actions speak louder

than words; and one cannot, at the same time, "blow hot and cold." Did not the appellee attempt to speculate in the subject-matter of his agency? Did he not get twenty-five per cent commission from Sanchez? And, by the terms of his secret contract with the purchasers, was he not to get twenty-five per cent commission from them also? Was the sphere of his conduct limited by either equity or good conscience? Was it right that he should have a semi-surreptitious commission of fifty per cent? And that, too, without having paid a dollar for the property, or been at a dollar's expense, and without having had any "hand whatever in negotiating the sale"? Was this not a fraud? And was not the fraud focalized when Jacobs made this speculative contract without the knowledge or consent of Sanchez, and failed to reveal it to him? "If a man, upon a treaty for a contract, will make a false representation, by means of which he puts the party bargaining under a mistake upon the terms of the bargain, it is a fraud." Did not Jacobs represent to Sanchez that they were to get five thousand dollars for the San Ricardo Mine? Was not Sanchez thereby deceived? Was that the price for the whole mine, or only three fourths of it? Did not Jacobs conceal from Sanchez the fact that in reality only three fourths of the mine had been sold for five thousand dollars, though Sanchez's deed was for the whole of it? In effect, Jacobs, by the terms of the sale, became a purchaser of one-fourth interest in the mine. In this position, according to well-established adjudication, he could not do this, especially when he mantled his conduct, and concealed the fact. In such cases the *suppressio veri* is as bad as the *suggestio falsi;* and it was as much a fraud upon Sanchez to conceal from him material facts concerning the sale as to have falsely represented the facts of the sale. This was positive, unmitigated fraud. Sanchez was certainly deceived; for he made a deed to the whole mine, and paid his agent, Jacobs, in good faith, twenty-five per cent of the whole five thousand dollars as commission. Jacobs says it was commission, in his receipt. True, he attempted by his individual parol testimony to contradict the receipt, and prove that it was something else; however, although this would infract a familiar rule of evidence, it was quite immaterial. The fact is he got twenty-five

Arizona 3—2

per cent of the purchase money. It was wholly immaterial, also, whether there was any actual injury resulting to Sanchez, or not; it was the misrepresentation and suppression of material facts from him by Jacobs which would have entitled him to equitable relief, and which, so far as Jacobs is concerned, vitiates and nullifies the contract, by which, unknown to Sanchez, the vendees were to deed back to Jacobs one fourth of the mine. An agent cannot profit off of the subject-matter of his agency. If he sells property intrusted to him for sale for more than the minimum price for which he is authorized to sell, his principal is entitled to the excess. And if the arrangement by which he obtains the excess is concealed from the principal, it is a positive and flagrant fraud upon the latter's rights; and courts of equity will not enforce the arrangement if it be unexecuted, though the principle is the same in its application, whether the contract is executed or unexecuted. And where the agent undertakes to act for both parties it is no matter whether either or both are affected injuriously; for each is entitled to all his skill, ability, sagacity, and discretion. And if the agent assumes this dual agency without fully disclosing to all parties concerned his double relations, and enters into a contract with either party by which he seeks to enhance his own interests, courts of equity will deny relief on such contract. Courts of equity will go further in granting relief in such cases than courts of law; but we apprehend such an equitable defense would be good even in an action at law. Certain it is that the forum of conscience will not tolerate this sort of duplicity. Here the demand is absolute for good faith and clean hands; anything less, equity regards as fraud.

Lord Hardwicke, in his letters to Lord Kames, said: "As to relief against frauds, no invariable rules can be established. Fraud is infinite; and were a court of equity once to lay down rules how far they would go, and no further, in extending their relief against it, or to define strictly the species of evidence of it, the jurisdiction would be cramped, and perpetually eluded by new schemes, which the fertility of man's invention would contrive." And Labeo, one of the best of the early writers, defined fraud to be "any cunning, deception, or artifice used to circumvent, cheat, or deceive another."

This has ever since been the accepted definition of actual fraud. Courts of equity, however, will not only take cognizance of and grant relief in this class of frauds, but will interpose in the matter of all frauds which may come from a "breach of legal or equitable duty, trust, or confidence, justly reposed, and which are injurious to another, or by which an undue and unconscientious advantage is taken of another." Now, one of the strongest rules invoking the interposition of a court of equity is where one who sustains the relation of agent to principal, or some relation of trust or fiduciary character, takes advantage of the ignorance, weakness, or necessity of another. Here a court of equity will always act *ex æquo et bono.*

The court below may have proceeded upon the idea that as, by the secret understanding between them, the vendees only got three fourths of the mine, therefore Jacobs was entitled to one fourth of the remaining fourth. As between Jacobs and Sanchez, this might be true; and he may be entitled to one fourth of the twelve hundred and fifty dollars paid by the vendees to Sanchez for that one fourth,—that far he may have a valid claim against Sanchez. But as between Jacobs and appellants it is greatly different. He is entitled to no relief by virtue of the contract between him and them. That contract was fraudulent, and is therefore invalid. Public policy, the interests of society, the rectitude and integrity of human conduct, good faith on the part of those who act for others,—especially with temptations and inducements to dereliction when intrusted with interests other than their own, —require that these contracts be not upheld. And the rule is thoroughly well established by a long line of decisions, and a great weight of authority, that they will not be. We call attention to the following: *New York Cent. Ins. Co.* v. *National Protection Ins. Co.,* 14 N. Y. 85; *Dutton* v. *Willner,* 52 N. Y. 312; *Cottom* v. *Holliday,* 59 Ill. 176; *Kerfoot* v. *Hyman,* 52 Ill. 512; *People* v. *Township Board of Overyssel,* 11 Mich. 222; *Scribner* v. *Collar,* 40 Mich. 375, 29 Am. Rep. 541; *Moore* v. *Mandlebaum,* 8 Mich. 433; *Railway Co.* v. *Dewey,* 14 Mich. 477; *Gaines* v. *Allen,* 58 Mo. 537; *Grumley* v. *Webb,* 44 Mo. 444, 100 Am. Dec. 304; *Jacobs* v. *George,* 2 Ariz. 93, 11 Pac. 110; Story on Agency, sec. 214; 1 Story's Equity Juris-

prudence, secs. 191, 204; 2 Pomeroy's Equity Jurisprudence, secs. 941, 948, 959; 1 Wait on Actions and Defenses, 246.

There are other questions in the case, but it is not essential that they be determined here. The judgment of the court below is reversed, and it is hereby ordered, adjudged, and decreed that the complaint be dismissed with costs.

PORTER, J.—I see no reason to change my views in this case as expressed in my opinion reported in 2 Ariz. 93, 11 Pac. 110, and therefore concur in the judgment of reversal and dismissal.

BARNES, J.—I do not concur. The defendants were not defrauded. They are simply asked in this case to pay what they agreed to pay for the mine. Sanchez only was defrauded, if anybody, and no relief is sought against him. He is not a party.