(Decided 22nd June, 1886.)

---

## WILLIAM H. SWIFT *vs.* SMITH, DIXON & CO.

*Private Corporation—Stock owned by one Person—Mortgage of Corporate property—Assignment of Stock—Equitable lien—Record.*

When one person becomes the sole owner of all the stock of a private corporation, he may renounce his rights under the Act of incorporation, and may conduct the business as a private individual, without corporate formalities.

While the purchase by such person of all the stock in the corporation and all its property, does not necessarily work a surrender of the company's franchise, it virtually, for the time being, suspends its operations as a corporation, until the election of new officers, through new stockholders purchasing from him.

While such sole owner, he may, individually, make a valid mortgage of all the property of the corporation, and the persons who afterwards take stock from him, and participate in perpetuating the operations of the corporation, will hold subject to the mortgage.

And with such mortgage of record, persons dealing with and trusting the corporation afterwards, will be affected with knowledge of the mortgage and be subordinated to it.

If the sole owner of the property of the corporation, from the moment of becoming such, had concluded to conduct the business as an individual, and without corporate formalities, the mortgage executed by him would have created a valid equitable lien on the property enforceable against him and his representatives ; and the execution, or attempted execution thereof by the corporation, would be wholly disregarded.

As a general rule when the charter and by-laws require transfers of stock to be entered in the books of the company to create membership of the corporation, the old membership is not wholly destroyed and a new membership perfected, until the transfers are so entered on the corporation books; but as between assignor and assignee of the stock, the assignee becomes the equitable owner immediately on the assignment and delivery to him of the certificate.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., YELLOTT, STONE, MILLER, ROBINSON, IRVING, and BRYAN, J.

*Frederick W. Story,* and *Edward Otis Hinkley,* for the appellant.

*George Whitelock,* and *S. D. Schmucker,* for the appellees.

IRVING, J., delivered the opinion of the Court.

On the 10th of January, eighteen hundred and eighty-five, "The Baltimore Gazette Publishing Company" made a deed of trust of all its assets to I. Parker Veazey, for the benefit of its creditors. The Circuit Court of Baltimore City, upon application of the trustee, took the trust under its jurisdiction, that the same might be administered under its direction. The auditor having made report to the Court, distributing the assets in the hands of the trustee among the creditors, the appellant and appellees respectively excepted to certain allowances to each other. The Court sustained the exceptions to the appellant's claim, and the same being disallowed, he appealed, and the only question before us is, whether the Circuit Court properly rejected his claim.

The claim of the appellant is based on a mortgage, executed by the Gazette Publishing Company, and by George W. Cruikshank, to him on the twenty-fifth day of February, eighteen hundred and eighty-five, by which "The Day, a newspaper published in the City of Baltimore, with the right to publish the same and the circulation and good will of the same," "the Associated Press franchise," and various machinery and chattels of the concern, were conveyed to the appellant, to receive the sum of seventeen thousand dollars, payable three years after date with interest, and evidenced by the note of George W. Cruikshank, and by notes for the interest to accrue and be paid annually. The history of this mortgage and the conditions moving to it are thus recited in its preamble: "Whereas by an agreement dated the 11th day of February, 1884, between the said William H. Swift, one William T. Croasdale and the said George W. Cruikshank, the said Swift agreed to transfer to said Cruikshank, all his, said Swift's estate and interest in and to ninety-four shares of the stock of the said body corporate, and to release the said company and the said Cruikshank

and said Croasdale, and all other stockholders of the said company of and from all claims and demands of every kind for money loaned, and for all other claims on account of said company in publishing the newspaper called 'The Day,' it being thereby intended to convey, or agree so to do, by means of the transfer of said stock of said company, all interest which said Swift has in the publication called 'The Day.' And whereas the said Swift thereby further agreed to purchase from W. J. Barndollar, one share of said stock held by him, and from H. S. Morrow, one share of said stock held by him, and to transfer the same to said Cruikshank, or cause them so to be transferred. And whereas, by said agreement, the said Cruikshank, in consideration of the execution thereof, did thereby agree simultaneously with the transfer of said stock and other interest by said Swift to him, to execute a proper bill of sale by way of mortgage," &c. Another clause recites that said agreement provided for the assignment and transfer to the said Cruikshank by said Croasdale, of all his stock and interest in the company, and to release all his claims against it. The next two clauses recite full compliance by Swift and Croasdale with their agreement, and their respective assignment of their stock, and the release of their respective claims against the company, and the stockholders thereof, and also the assignment by Barndollar and Morrow of their stock to said Cruikshank. The next clause recites the execution of the notes for principal and interest of the seventeen thousand dollars agreed upon, and that the mortgage was in consideration of the premises. This mortgage was signed by George W. Cruikshank under his own seal, and by Wm. T. Croasdale, as president of the Gazette Publishing Company who affixed the seal of the corporation. It was acknowledged before a justice of the peace for Baltimore City, by Cruikshank, on his own behalf, and by C. Augustus E. Spamer, on behalf of the corporation, he having

been named in the deed for that purpose. The mortgagee made the affidavit that the consideration was true and *bona fide* as set forth, and the mortgage was duly recorded as a chattel mortgage in the proper office.

In the distribution of the proceeds of sale by the trustee, and of all the assets of the Gazette Publishing Company, the *auditor allowed* the appellant for his mortgage claim, so much of the assets as were left after deducting expenses and some claims supposed to have priority; and by that allowance, if sustained, he will receive but little more than two-thirds of his claim.

To this allowance the appellees, who are creditors of the company for dealings had with them by the company since the execution of the mortgage, except on the ground, that the mortgage, as an act of the company, was *ultra vires*, and for sundry technical reasons supposed to render the execution of the mortgage ineffectual and fatally defective on the part of the company, even if the company had the power under the facts to make it.

The making and delivery of the mortgage by the President on the behalf of the company, it is contended, was in violation of Article eleven and twelve of the by-laws of the corporation, and that the signature of the President is not countersigned by the secretary as required by section three of Article seven of the by-laws. Article eleven limits the power of the directors in incurring obligations other than for materials and labor, and forbids them doing so without a majority *vote* of the directors. Article twelve, which is especially relied on, reads as follows: "the moneys or effects of the company shall never be loaned to or used for the benefit of any person, nor shall the name of the company be used as drawer, acceptor or endorser except in the legitimate and proper course of the business of the company."

These objections and others which need not be named, were pressed with much ability and learning, and were

fortified with many authorities, which would be conclusive, if the facts and nature of the transaction warranted their application.

We think the mortgage to Swift was good, and operative to charge the property conveyed by it, irrespective of the attempted execution by the company. At the time of its execution, Cruikshank had become the owner of all the stock of the company, and of all its property. From that moment he might have renounced his rights under the Act of incorporation, and might have conducted the business as a private individual without corporate formalities. Being thus absolute proprietor in equity of all that belonged to a purely private enterprise, in which the public had no interest whatever, we know of no principle, on the ground of public policy or otherwise, requiring his act in charging the property for the agreed indebtedness of the corporation to Swift, for loans to and claims against it, and for his stock in it sold to Cruikshank, to be denied efficacy, because he had not then re-organized the company and brought in other persons to help him to do that in a corporate way, which, we think, from the very nature of the business, he had the right to abandon entirely ; and even the business if he chose.

A man can certainly do what he pleases with his own property, if he does not thereby prejudice any of the rights of subsisting creditors. It does not appear that any existing creditors were injuriously affected thereby. The appellees became such afterwards. It is true, that the corporation, as such, united, (whether effectually or not, is immaterial to discuss,) with Cruikshank in the mortgage. Why it was thought necessary for it to do so we do not know. Its doing so has certainly complicated the matter, and, as we think, diverted the mind of the Court below from the true and only equitable aspect of the case. If there had been no attempt on the part of the corporation to unite in the mortgage, and it had only been executed

by Cruikshank, who was the sole owner of all the property mortgaged, how could it have been denied operation? And would not the persons who took stock from Cruikshank afterwards, and participated in perpetuating the operations of the corporation, have held subject to the mortgage put on the effects of the corporation before they bought the stock? And with such mortgage of record, would not persons dealing with and trusting the corporation afterward, be affected with knowledge of such mortgage and be subordinated to it? There would seem to be no escape from such conclusion. In *Bellona Company Case,* 3 *Bland,* 446, the Chancellor says, the ownership by one person of all the stock of a private corporation aggregate virtually dissolves the corporation. For the time being it certainly does suspend corporate action, although according to the now generally received understanding of the law, such sole owner may dispose of some of his stock to others and continue the corporate existence by the election of necessary officers. *Russell vs. M'Lellan,* 14 *Pickering,* 70; *Newton Manuf. Co. vs. White,* 42 *Georgia,* 148; *Boone on Corporations, secs.* 199 *and* 200.

While, therefore, the purchase by Cruikshank, of all the stock in the corporation, and all its property, did not necessarily work a surrender of the company's franchise, it did virtually, for the time being, suspend its operations as a corporation until the election of new officers through new stockholders purchasing from Cruikshank. If from the moment of becoming sole owner, Cruikshank, as already suggested, had concluded to conduct the business as an individual, and without corporation formalities, can it be doubted that, in such case, this mortgage executed by him created a valid equitable lien on the property, enforceable against him and his representatives, and that in such case, the execution or attempted execution thereof by the corporation could be wholly disregarded? The mortgage expressly provides for the payment to Cruikshank or his

representatives, (and not to the corporation,) of any surplus proceeds after satisfying the mortgage, in case of sale for default. It thus appears that the transaction was regarded by the participants in it, (and all who were interested did participate,) as giving Cruikshank the absolute control and ownership of all that pertained to the company. If so, his right to equitably charge it with the company's debts and his own ought not, it would seem, to be questioned. But it is contended, that his title was not perfected, even in equity, because the stock assigned to him by the withdrawing members was not actually transferred on the corporation's books. That was not done; and if that was essential to make the newly acting members stockholders, it was not legally perpetuated. The company started afresh. Cruikshank sold shares to other persons, and by arrangement and common consent, the old stock was all cancelled and new shares were issued to all, including Cruikshank, according to the agreed interests of the several parties in the concern. The corporation, under this reorganization, continued business, and these appellees became creditors of it. This method of procedure certainly cannot injuriously affect the appellant's case in a Court of equity. The stock purchased by Cruikshank was assigned in blank, and the certificates were delivered to him. As between him and the assignors the title effectually passed to him. *Johnson vs. Laflin*, 103 *U. S.*, 804. As a general rule, when the charter and by-laws require transfers of stock to be entered on the books of the company to create membership of the corporation, the old membership is not wholly destroyed and a new membership perfected, until the transfers are so entered on the corporation books. *National Bank vs. Watsontown Bank*, 105 *U. S.*, 222; *Balto. Retort Fire Brick Co. vs. Mali*, *ante page* 98, of this volume. But in the last cited case this Court held, that in the case of an actual sale of

stock *for value,* equity would treat an assignment of stock as giving equitable title, and would interfere and enforce an actual transfer on the books, when it would not interfere in the case of a voluntary transfer "without consideration," which was imperfect and executory. The eighth Article of the by-laws of the company provides, that "the secretary shall sign all certificates of stock and make all transfers thereof on the books of the company;" and the certificates on their face recite that they are transferable only on the books of the company. As a means of keeping an accurate record of who the stockholders are from time to time, and who are entitled to vote at their meetings, that is a very wise provision; but there is nothing in that provision inconsistent with the view that as between *assignor and assignee* of the stock, the assignee becomes the equitable owner immediately on the assignment and delivery to him of the certificate, and can enforce actual entry on the books of such transfer, by way of perpetuating evidence of his title. Another method of perpetuating the corporate existence and continuing its operations, was, as already stated, adopted by the surrender of all stock and the re-issue of new stock to all the members. If Cruikshank was not the absolute owner of the stock, it is hard to perceive how the corporation was effectually continued in existence by this proceeding. Whether it was or not is immaterial to this decision. We are clearly of opinion that under the facts of this case, it would be grossly inequitable not to regard Cruikshank's title, acquired as it was, as an equitable title, and that he had a right to change it in favor of the appellant, whose claim is so undeniably *bona fide,* unless the appellees have some paramount and superior equity.

The appellees' claim arose from sales to the corporation and credit accorded it after the mortgage to Swift, and after the reorganization of the corporation and the reissue of the stock to the new members of the corporation. They

had constructive knowledge of the mortgage deed to Swift and all its recitals; and they had, in addition, *actual knowledge* that Swift had a mortgage; for, *to this, one of the appellees testifies.* Having trusted the corporation, therefore, subsequently to appellant's obtaining his mortgage, and with a knowledge of that fact, both actual and constructive, the appellees certainly have no superior equity to prevail over the appellant; and their sole claim to recognition in preference to him rests on the contention for technical infirmities in the title acquired by Cruikshank to the stock, and in the execution of the mortgage by the corporation. With respect to the transfer of the stock we have already indicated our opinion to be that Cruikshank in the transaction acquired an equitable title, good against vendors and assignors, and which title he could equitably charge with his debts. It must be observed that we deal with this corporation as one organized purely for private gain; the success or failure of which affected no one but the parties interested and engaged in it,—an enterprise having no public object, in which the public have an interest; and when, as in the case of a railroad for example, public policy might forbid the application of the principles adopted. Inasmuch as we think Cruikshank, at the time he executed the mortgage, had an equitable title to the property mortgaged, and could in equity charge that property, it is unnecessary for us to consider or decide whether the execution of the mortgage by the company was effectual or not. What we do decide in this case is, that conceding the execution of the mortgage by the company to have been ineffectual and void, still the execution of it by Cruikshank, who was  at the time the substantial owner in equity of the corporation and property, was sufficient to charge the property mortgaged and to give the mortgagee an equitable title and effectual lien thereon. This being our conclusion it follows, that there was error in the order of the Court re-

jecting the auditor's report, which allowed appellant's claim; to that extent therefore that order must be reversed.

*Order reversed, and*
*cause remanded.*

(Decided 23rd June, 1886.)

Judges MILLER and BRYAN dissented.