# WILLIAM H. MINCH

*vs.*

# THE MINCH & EISENBREY COMPANY ET AL.

*Corporations—Minority Stockholders—Abolition of Office—Salaries and Dividends.*

On an issue as to the right of the majority stockhoders of a corporation to terminate a contract between them and a minority stockholder, by which he was to receive an annual salary, *held* that the majority stockholders had such right, it not appearing that the salary was intended to be permanent, and it being inferable that it was to be paid in consideration of the minority stockholder having had to advance a greater sum than originally anticipated in order to effect a sale of his business to the corporation, and that it was to endure only until his investment was reduced to the amount originally contemplated.

pp. 430, 431

Where the directors of a corporation have changed the by-laws so as to create an office for one of them, the directors can, in the absence of any violation of contract, again amend the by-laws by abolishing the office. p. 432

Where sums paid corporate officers were treated in the minutes of the company, and by the directors, as salaries, one of such directors, who accepted the payment to him as salary, could not claim that such payments were dividends, especially if the payment of such dividends was forbidden by the by-laws.

p. 432

That the salaries of the four stockholders in a corporation, all four of whom were also officers thereof, were increased in proportion to the amounts of the stock held by them, does not make such increases a corporate dividend. p. 432

*Decided November 17th, 1921.*

Appeal from the Circuit Court No. 2 of Baltimore City (STUMP, J.).

Bill by William H. Minch against The Minch and Eisenbrey Company, and others. From a decree for defendants, plaintiff appeals. Affirmed.

The cause was argued before BOYD, C. J., BRISCOE, THOMAS, PATTISON, URNER, STOCKBRIDGE, ADKINS, and OFFUTT, JJ.

*Joseph C. France* and *Robert Biggs,* for the appellant.

*G. W. S. Musgrave* and *Charles F. Harley,* for the appellee.

ADKINS, J., delivered the opinion of the Court.

In the fall of 1912 the appellant, Minch and his partner, Eisenbrey, trading as Minch and Eisenbrey, merchants in Baltimore City, agreed to sell their business to three of their employees, Charles E. Allen, D. Norris Kelly and Edgar B. Browning, the individual appellees in this case, at the inventory value of the stock of goods on hand.

A company was incorporated, capitalized for $125,000, of which amount $75,000 was non-voting and redeemable preferred stock, and $50,000 common stock of the par value of $100 per share. The preferred stock was placed with investors, Minch taking $5,000. Under the orginial plan the individual appellees were to take all of the common stock (voting shares) as follows: Allen, 200 shares ($20,000); Kelly, 200 shares ($20,000); and Browning, 100 shares ($10,000). Minch agreed to lend each of them $7,500 without security. After the incorporation, however, Allen and Kelly found themselves unable to raise the required amounts over Minch's loans to them, Allen being short $2,000, which shortage Minch agreed to lend him on a second mortgage of his home.

Just before February 1st, 1913, when the transaction was to be consummated, Kelly announced that he could raise no money at all, whereupon Minch agreed to increase his loan to Kelly from $7,500 to $10,000 and to take 100 of the 200 shares to which Kelly had subscribed, the result being that Minch's loans to the individual appellees was $27,000 instead of $22,500 as originally agreed upon, and he became interested directly in the business to the extent of $10,000 as a common stockholder, which had not been contemplated or desired by him.

The situation having thus changed, Minch felt that he should have some oversight of the new business and stipulated that he should have an advisory connection with the business in order to be in a position to look after his interests, and he made it a condition that he should receive $1,000 a year out of the net profits of the concern, in addition to any dividends he might receive on his common stock.

It appears from appellant's testimony that he regarded the $1,000 as a fair offset to the salaries which appellees were to get in excess of the compensation they had previously received, it having been agreed that each of them should get $1,500 more, which was to be applied to the reduction of their indebtedness to appellant.

At the close of the year 1916, Minch suggested that, in view of the volume of business, the company could legitimately increase salaries with a view to reducing the burden of the Federal corporation tax. He proposed that $10,000 be devoted to this purpose, in proportion to the holdings of common stock, so that the additional amounts received would be as follows: by Allen $4,000, by Kelly $2,000, by Browning $2,000, and by Minch $2,000. As a necessary part of the plan, Minch was to be elected a director and vice-president with official duties, a room was to be fitted up for him, and the by-laws were to be so amended as to increase the number of directors and to create the office of vice-president and define its duties All of which was actually done.

Under the arrangements above detailed Minch received for the years 1913, 1914, and 1915, a salary of $1,000 per year, and for the years 1916, 1917, 1918, and 1919, a salary of $3,000 per year, in all $15,000.

The facts as above set out are taken substantially from appellant's brief, and are supported by appellant's testimony, except that in his testimony he insists that the plan proposed by him in 1916 for a distribution of the extra $10,000 was really meant and understood to be a distribution of extra dividends amongst the holders of common stock under the guise of increased salaries.

By the end of 1919 appellees had paid off all their indebtedness to appellant, and at the annual meeting on January 31st, 1920, he was not re-elected as a director, and at a subsequent meeting on March 8th, 1920, the amendments to the by-laws made in January, 1917, increasing the number of directors and creating an office for him, were repealed and the by-laws changed to their original form.

The prayer of the bill in this case is:

First: That a mandatory injunction be issued requiring the said Allen, Kelly and Browning to call a meeting of the stockholders of the Minch and Eisenbrey Company, and requiring them to rescind the action taken by them wherein and whereby they undertook to reduce the number of the directors from four to three and to oust the plaintiff from the position of director and from the office of vice-president of the company, and requiring them further to hold a special meeting for the election of directors and to re-elect plaintiff as one of said directors, and further requiring them to hold a special meeting of the board of directors and to re-elect plaintiff as vice-president of the company, and requiring them to account to plaintiff for the sum of $3,000, due him under said agreements.

Second: That in the alternative the defendants may be required to pay to plaintiff the fair value of his investments in his stock in said company.

The contention of appellant is that the salary of $1,000 for him, originally agreed upon, was a matter of contract between him and the appellees as individuals, and was a condition precedent to his subscription to the common stock; and that the subsequent arrangement for increase of salaries to appellant and appellees was really an agreement to appropriate $10,000 of the earnings to the payment of an extra dividend. It is charged that under the cover of corporate form appellees repudiated the burden of their agreement with appellant while still retaining its benefits; and that, in equity and good conscience, they should either carry out the agreement or refund his capital, namely, the fair value of his stock.

The cases of *Breslin* v. *Fries,* 70 N. J. Law, 274; *Swift* v. *Smith,* 65 Md. 428; *Stokes* v. *Detrick,* 75 Md. 256; *Cantor* v. *Baltimore Overall Co.,* 121 Md. 70; *Wootton Land & Fuel Co.,* v. *Ownbey,* 265 Fed. 95; are cited in support of the proposition that, where all the stockholders enter into an agreement, it cannot be repudiated by the corporation to the prejudice of one relying upon it, simply because it was not the formal act of the corporation, there being no question of the rights of creditors or other outsiders.

But it does not seem to us that that principle is applicable to the facts of this case. As to the original salary, the evidence is not convincing that it was intended to be permanent or that the arrangement was made solely because of appellant's subscription to the common stock; but rather because of the increase in the total amount of money he was required to put up to finance the venture. Originally it was to be $22,500, and then there was no demand for a salary or allowance of any compensation except interest on the loans. When appellant found that it would be necessary for him to put up $37,000—$27,000 in loans and $10,000 in common stock— "that," as he testified, "put an entirely different version on the case, and I felt, having $37,000 in there instead of $22-500, it was up to me to look after my interest to a certain

extent. Q. What did they say in reference to that? A. They said nothing; they acquiesced. Q What did they say with reference to your having $1,000 per annum as your interest in the concern—money interest in the concern, the same as they were getting $1,500 each as their money interest in the concern; what did they say about that? A. They said nothing about that, they accepted it."

Apparently nothing was said about how long this allowance was to continue. But it is not unreasonable to infer that the allowance having been agreed to because of the increase in the amount of appellant's interest in the concern, it could be discontinued when that interest should be reduced to the amount originally contemplated. It is not contended that appellant regarded his investment of $10,000 in the common stock as more hazardous than the unsecured loans to appellees which he agreed to make to the amount of $22,500 without compensation; although at another place he varies his original version of what took place in reference to the $1,000 allowance, and says that he told Browning and Allen, "It places a different version on the concern, I want $1,000 for the $10,000 that I put in." The evidence shows that he voluntarily bought preferred stock of the corporation.

There is less difficulty about the $2,000 additional salary or allowance, which appellant claims was really intended as his proportion of an extra dividend. In the first place there was certainly no contract in regard to this. It seems to have resulted from appellant's proposal, followed by a resolution regularly passed at a directors' meeting held November 1st, 1916. A motion was made at this meeting "to provide for some compensation for Mr. William H Minch, who has rendered services of value to the corporation during the year," on which motion it was resolved "that the sum of $2,000 be paid to Mr. William H. Minch at the end of the fiscal year as compensation for services rendered the company during the current year."

It was also resolved that suitable provision be made for the creation of an office for Mr. Minch, to enable him to more actively participate in the business of the company.

At the same time the salaries of appellees were increased, Allen's $4,000, Kelly's $2,000 and Browning's $2,000.

It being proposed that Minch should become a director, a resolution was passed providing for a call of a stockholders' meeting to change the by-laws increasing the number of directors and separating the offices of vice-president and treasurer. The stockholders' meeting was duly called, the by-laws changed as proposed, and Minch elected one of the directors; and at a subsequent directors' meeting Minch was elected vice-president.

The minutes show that appellant was present at the stockholders' meeting when the by-laws were changed and he was elected a director; also at the directors' meeting following, at which he was elected vice-president.

Whatever Minch may have called the $10,000 distributed between himself and appellees, it was certainly treated by himself and the other directors as salary in the minutes of the company, and he received his part of it as salary. He must have known that the only purpose of changing the by-laws, so that he might become a director and vice-president, was to give him an office to which the salary could be attached. Having assented to this, we think it is now too late for him to call it a dividend, especially as the by-laws of the company forbade the declaration of such a dividend, and it will not be presumed that there was intended to be a tacit repeal of this by-law, as that would be inconsistent with the minutes.

In the absence of a violation of contract, which we do not find, it was within the power of the stockholders to amend the by-laws and abolish the office which they had created for appellant.

There is no evidence, and it is not charged, that the salaries paid appellees are fraudulent or excessive. Even if the increase of salaries was purposely made proportionate to the

amount of stock held by the officers respectively, that of itself would not change the character of the payments.

It may be that appellees have been wanting in appreciation and gratitude. We certainly do not wish to be understood as approving the manner of the summary dismissal by them of their benefactor without consultation with him or previous notice of their intention, even though his beneficence may not have been entirely disinterested. But we do not find in the record any basis for equitable relief.

> *Decree affirmed and bill dismissed, with costs to appellees.*