**MUCKLE v. FITTS et al.**

District Court, S. D. Alabama, N. D.
March 9, 1933.

Sam F. Hobbs, of Selma, Ala., for Richard Muckle and Mrs. F. T. Turnipseed.

W. R. Withers, of Greensboro, Ala., Keith & Wilkinson, of Selma, Ala., and McEniry & McEniry, of Bessemer, Ala., for Jacob Salmon, receiver First. Nat. Bank.

Pettus, Fuller & Lapsley and Craig & Brown, all of Selma, Ala., for Greensboro Warehouse Co., Inc.

E. V. Otts and C. L. Kelly, both of Greensboro, Ala., and R. B. Evins, of Birmingham, Ala., for E. P. Walsh.

Tom B. Ward and J. M. Ward, both of Tuscaloosa, Ala., and Stevens, McCorvey, McLeod, Goode & Turner, of Mobile, Ala., for Frank Fitts.

Pettus, Fuller & Lapsley, of Selma, Ala., and Stevens, McCorvey, McLeod, Goode & Turner, of Mobile, Ala., for H. A. Taylor.

R. B. Evins, of Birmingham, Ala., for Mrs. Herteline R. Cryer, Mollie, Julia, and Mrs. Herbert Childress.

ERVIN, District Judge.

J. A. Blunt was president of the First National Bank of Greensboro and was also the president of the Planters' Bonded Warehouse Company of Greensboro, Ala. The warehouse company was incorporated in Hale county in 1907, having a capital stock of $15,000, divided into shares of $100 each, and the shareholders were J. A. Blunt, H. C. Childress, and R. C. Oliver. Childress and Oliver each subscribed for five shares, and Blunt subscribed for the rest, and paid for those of Childress and Oliver. Very shortly after the incorporation of the warehouse company Childress and Oliver transferred their shares to Blunt, and Oliver seems to have gone out of the business altogether.

During this period and up to the time of his bankruptcy Blunt was very prominent in the financial circles around Greensboro, being reputed to be a wealthy man as he in fact was, and being engaged not only in managing the First National Bank of Greensboro and this warehouse company, but also several of the industries in and around Greensboro, and was also a large property holder in the city of Greensboro and was the financial advisor of a large portion of the citizens of Greensboro.

After the transfer of all the shares to Blunt he considered the whole property to be his, and managed it as though he held the legal title to the real estate as well as to the shares of stock. The property owned by the warehouse company was a site close to the Southern Railroad station in Greensboro, on which the warehouse was formerly located and operated by Blunt and another. This warehouse burned and the insurance collected, and this, with the proceeds of a suit against the Southern Railroad Company for setting fire to the warehouse, paid off the owners of the cotton stored in it at the time of the fire, and probably left something over, but the proof of the amount is indefinite. .

After the fire Blunt bought out his partner and shortly thereafter the present warehouse corporation was organized and the present structure, a brick building with reinforced concrete roof, was erected on the site of the old warehouse. In addition to storing cotton, Blunt conducted a business in the warehouse of selling coal, lime, cement, lumber, and some other commodities periodically, which business was run for him by H. C. Childress, until July, 1925, when all these side lines were abandoned and the warehouse was leased by Blunt to George C. Clements and R. Q. Clements for a term of ten years at the annual rental of $2,400, payable in four installments of $600 each. The lessee further agreeing to keep the property in good repair, reasonable wear and tear excepted, during the term of lease. This lease recites: "By and between the undersigned, J. A. Blunt, who has been doing a warehouse business under the name and style of the Planters Bonded Warehouse Company, and who owns all of the property of said Planters Bonded Warehouse Company and is the sole owner of the said Planters Bonded Warehouse Company, party of the first part, and George C. Clements and R. Q. Clements, the parties of the second part."

Subsequent to the lease, George C. Clements sold his interest in the lease to H. C. Childress, before the addition to the warehouse was built, and the business was conducted in the name of the Greensboro Warehouse Company, Inc.

The original minute book shows that at the first meeting each of the stockholders were elected as directors, and that J. A. Blunt was elected president and H. C. Childress elected secretary and treasurer. No other minutes appear until 1909 when the president and secretary and treasurer were authorized by the meeting to make a mortgage to Mrs. Ely to secure a loan of $6,000. The minutes of this meeting recite that the stockholders and directors were present and that J. A. Blunt then owned 120 shares, H. C. Childress 20 shares, and R. C. Oliver 5 shares. According to the recital, 5 shares were then unaccounted for. Thereafter no further meetings are shown.

On December 13, 1910, a mortgage was executed to the First National Bank of Greensboro, of which Blunt was president, by the Planters' Bonded Warehouse Company to secure $11,965. This mortgage was signed by J. A. Blunt, president, and H. C. Childress, secretary-treasurer, and recited a meeting of the stockholders and authorization by the stockholders and directors. It was recorded and later marked satisfied on the record, March 15, 1912.

On the second day of March, 1912, a mortgage was made to Mrs. Carrie M. Dickens to secure $12,000. It was signed Planters' Bonded Warehouse Company by J. A. Blunt, president, and was not signed by Childress, and does not recite any authorization by the directors or stockholders, and is marked satisfied on the record, April 13, 1929. Presumably this mortgage was made to get the money to pay the First National Bank, as its mortgage was marked satisfied on the 15th day of March, 1912.

On January 19, 1927, H. C. Childress died, and thereafter his wife found in his safety deposit box certificate No. 6 for 10 shares of stock in the warehouse issued to Blunt and indorsed by him.

On March 23, 1927, a deed was executed by the Planters' Bonded Warehouse Company, by J. A. Blunt president, purporting to convey the warehouse property which was at that time all the property owned by the warehouse company to J. A. Blunt. This deed was recorded March 23, 1929, just two years after its date.

On March 20, 1929, J. A. Blunt executed to Grace McFaddin a mortgage conveying the same property to secure $5,000, which was assigned on January 16, 1931, to Frank Fitts.

On December 29, 1930, J. A. Blunt executed a mortgage to H. A. Taylor to indemnify him against such loss as he might suffer because of his signing a bond as a surety of the First National Bank to Hale county. Taylor agreed to subordinate his mortgage to that of Fitts.

The county of Hale had deposits ranging from twenty to thirty thousand dollars in the First National Bank, and this bond was to secure the county for such money as it might have on deposit in the bank.

On January 15, 1931, Blunt executed a mortgage to Frank Fitts for $5,000. All these mortgages were on the same property.

In the year 1926 an addition to the warehouse was erected at the request of lessees, who agreed to pay $100 a month additional rent, and upon the execution of the mortgages by Blunt to Frank Fitts a policy of insurance was taken on the property in favor of Blunt, with loss, if any, payable to Frank Fitts, as his interest might appear, and in October, 1931, this new section of the warehouse was destroyed by fire. There were conflicting claims for this insurance between Fitts and the receiver of the First National Bank, and the insurance company paid under a compromise arrangement between these

parties the amount of $1,224.20, which is now held by I. N. Hobson, clerk of circuit court of Hale county, to await determination of these claims.

Blunt borrowed money from Mrs. Herteline R. Cryer and delivered to her a certain number of shares of stock in the warehouse company to secure the loan.

He also borrowed money from E. P. Walsh and delivered to him a number of shares of the stock as security.

He also borrowed from Mrs. F. T. Turnipseed, delivering a number of shares of stock to her as security, and up to the time of his bankruptcy these loans had not been paid.

Blunt was declared bankrupt on the 4th day of January, 1932, on an involuntary petition filed in this court on November 20, 1931, and on January 18, 1932, Richard Muckle was elected as his trustee. The First National Bank of Greensboro, of which Blunt had been president for many years, failed in 1931, and one Montgomery was appointed receiver, and Jacob A. Salmon succeeded Montgomery as receiver for the First National Bank.

Blunt, on December 1, 1927, gave a note for $5,000 to the First National Bank, which was signed Planters' Bonded Warehouse Company, by J. A. Blunt, president. On December 15, 1927, he gave another for $5,000 to the same bank, signed in the same way. On March 2, 1929, he gave another note for $1,500 to the same bank, signed in the same way. Montgomery, as receiver of the First National Bank of Greensboro, brought suit in the circuit court of Hale county against Planters' Bonded Warehouse Company, a corporation of Greensboro, Ala., on these three notes, which was filed September 21, 1931, and service was had on J. A. Blunt, as president and director of the Planters' Bonded Warehouse Company. On October 24, 1931, judgment by default was entered in this case, which was made final in the sum of $19,168.72, and this judgment was filed in the probate court.

Various bills were filed by Mrs. Cryer, E. P. Walsh, Mrs. Turnipseed, and others, seeking various reliefs as against Fitts and the warehouse company and others. The trustee in bankruptcy, Muckle, then filed this bill making all the various claimants parties, and seeking to remove these claims as clouds on his title, and praying that injunction be granted against the various suits in the state court, and that the property owned by the warehouse company be subjected to the payment of the debts owing by Blunt, and the

claims of all these various parties be set aside and the property be ultimately sold. The various claimants have come in and attacked the jurisdiction of the court which was overruled. Isaacs v. Hobbs Tie & Timber Co., 282 U. S. 735, 51 S. Ct. 270, 75 L. Ed. 645; Rogers v. Haines, 114 Ala. 50, 21 So. 411.

Answers and cross-bills have been filed and testimony taken, and the court proceeds to determine the equities of the various parties.

As to the claim of the receiver of the First National Bank:

■ It is based on a default judgment in the circuit court of Hale county. The complaint was a suit on the three notes heretofore mentioned, executed by Blunt in the name of the Planters' Bonded Warehouse Company to the bank, and was served on Blunt as president of the warehouse company. The proof shows that the warehouse company had conducted business from 1907 to 1925, and had been indebted to the bank at various times between those dates, and had paid up these debts.

That it had executed a mortgage to the bank in 1910, and this mortgage was paid and canceled March 15, 1912.

That Blunt, who was the president of both companies, was accustomed to execute notes in the name of the warehouse company to the bank, because he claimed to own all the stock of the warehouse company, and because he could not borrow personally from the bank, as he was its president.

The warehouse company quit business in 1925 when Blunt leased the warehouse property to George C. Clements and R. Q. Clements for a term of ten years at $2,400 a year, reciting that he was the sole owner.

The notes of the lessees were payable in quarterly installments of $600. These notes aggregating $24,000 and the $100 a month for the addition were transferred by Blunt to the bank. The notes sued on by the bank bear date more than two years after the warehouse company quit business.

Blunt testifies he borrowed only $4,000 from the bank for the purpose of erecting the additional section to the warehouse.

How could it have incurred this indebtedness to the bank?

Blunt testifies they were given for the debt of the warehouse company, but there is no proof of how it became so. He does not undertake to give the facts.

There is no proof that the money loaned by Blunt as president of the bank ever went to the warehouse company or paid any of its debts, or was borrowed for any corporate purpose of the warehouse company. I am forced to conclude that Blunt, who at that time was beginning to be financially pressed, borrowed the money, but gave the notes of the warehouse company for it just as he had done before.

■ Notes executed by a corporation when it does not owe the debt create only the relation of surety to the real debtor, and if not within the corporate powers are ultra vires and void. First National Bank v. Winchester, 119 Ala. 170, 24 So. 351, 72 Am. St. Rep. 904.

■ It may be that Blunt incurred an obligation to the bank when he executed the notes in the name of the Planters' Bonded Warehouse Company, but they created no liability of the warehouse company, for it had no authority to secure debts of others.

■ But it is said that the bank reduced the claim to judgment, and the parties cannot go behind such judgment. Conceding for sake of argument that the warehouse company cannot do so, because Blunt, on whom the complaint was served, was its president, and it has had its day in court, and did not set up the defense, still what day has the trustee in bankruptcy, Fitts, Taylor, Mrs. Turnipseed, Mrs. Cryer, and Mrs. Childress and her children had. No service was had and no notice was given to any of them, and the judgment was by default. Had the suit been defended it could easily have been defeated on the facts regardless of the threats to Blunt.

"Persons having liens on or claims to property which was the subject matter of a former action, or rights of action against one or more of the parties thereto, are not bound by the judgment if they were not made parties to the suit, and had no right to be heard or to appeal from the judgment, although their claims were brought into issue in such action, or although their rights depend upon the same transaction or facts which were litigated and decided in that action." 34 Corpus Juris, p. 988, § 1406.

As to the claim of Frank Fitts:

■ The Planters' Bonded Warehouse Company was incorporated in 1907, having three stockholders, J. A. Blunt, H. A. Childress, and R. C. Oliver. Shortly after the corporation was formed Childress and Oliver transferred their stock to Blunt, who then became sole owner of all the stock.

The proof shows that Blunt was then a well-to-do man, and that he built the present warehouse, which cost many thousand dollars

more than the capital stock of $15,000, and that Blunt paid this excess out of his own pocket.

That Blunt wanted the corporate entity to run the business so as to limit his liability as a warehouseman.

That Blunt hired H. C. Childress to operate the business in the name of the Planters' Bonded Warehouse Company, and not only ran a warehouse business in it, but also a coal, lumber, lime, and some other lines spasmodically there.

The various lines were run from 1907 to July, 1925, when the property was leased by Blunt to Clements & Clements.

The property was mortgaged to Mrs. Goldine M. Ely on April 27, 1909, by the warehouse company for $6,000, and the minutes state that Blunt then owned 120 shares, H. C. Childress 20 shares, and R. C. Oliver 5 shares.

There is no proof that either Oliver or Childress bought any stock from Blunt; nor does the stock book show any transfer to them.

Undoubtedly Blunt just delivered to each of them a certificate of stock just for the purpose of the meeting so they could make the entry on the minutes. This mortgage was canceled. On December 13, 1910, a mortgage was made to the First National Bank for $11,965. It was signed Planters' Bonded Warehouse Company, by J. A. Blunt, president, H. C. Childress, secretary-treasurer, and recites a meeting of the stockholders, but no such meeting is shown by the minutes.

This mortgage was canceled March 15, 1912. On March 2, a mortgage for $12,000 was made to Mrs. Carrie M. Dickens and was signed Planters' Bonded Warehouse Company, by J. A. Blunt president, only. No minutes show authorization for this mortgage. It was marked satisfied on April 13, 1929.

On January 19, 1927, H. C. Childress died.

All these mortgages convey the same property, the warehouse and lot, being all the warehouse company owned.

No books seem to have been kept by the warehouse company showing its assets and indebtedness. Under these circumstances I must find that the warehouse company owed no debts to any person other than J. A. Blunt, to whom the deed of March 23, 1927, was executed signed Planters' Bonded Warehouse Company, by J. A. Blunt, president, to J. A. Blunt, conveying same property. It recites a consideration of $10 and other good and valuable considerations. Did the warehouse company then owe Blunt anything?

Conceding he advanced from twenty to thirty thousand dollars to build the warehouse, no other evidence of indebtedness or note was given him.

He ran the business as his own, taking all the profits for nearly twenty years until he rented it out in 1925, and then took the rent notes aggregating $24,000 and $100 a month for the addition and running over a period of ten years, and indorsed them over to the First National Bank, of which he was president. There has never been an accounting between Blunt and the warehouse company.

I must conclude that at the time of the execution of this deed the warehouse company did not owe Blunt anything, so it owed no debt at that time.

Was any party other than Blunt the owner of any stock in the corporation at that time?

There can be no doubt that both Oliver and Childress transferred their certificates of five shares each to Blunt shortly after the incorporation in 1907.

There is no claim that Oliver ever acquired any shares thereafter. In fact, both of them were mere dummies for Blunt in order to perform corporate acts.

The only evidence of any shares owned by any one other than Blunt is the certificate for 10 shares in Blunt's name found by Mrs. Childress in her husband's box at the bank after his death.

An examination with a powerful glass shows that the date of assignment was July, 1920 or 1925. Both the date and name of the transferee have been erased as well as a name under that of the witness. If the date is July, 1920 or 1925, it was not held by Childress in 1909, the date of the meeting recorded in the minutes. The erasures are not explained.

I conclude, therefore, that just for the purpose of the meeting Blunt delivered 5 shares to Oliver and 20 to Childress, and that these shares were then redelivered to Blunt. Blunt testifies that the certificate was held by Childress to secure a loan of $700.

The lease by Blunt to Clements & Clements expressly recites that Blunt was the sole owner of the property, and that he had run the business in the name of the company.

Now H. C. Childress was hired by Blunt to operate the business for him. Childress died in 1927, so we do not have his testimony,

but R. Q. Clements testified that during the summer of 1926 Childress became his partner in operating the warehouse under this lease.

Therefore Childress ran all the business ventures operated by Blunt at the warehouse from the time of its incorporation till it was leased to Clements & Clements.

That he never participated in any of its profits or claimed any rights in it up to his death in 1927, but knew all the time that Blunt claimed sole ownership.

That he bought an interest in the lease from Clements when such lease expressly stated Blunt's claim of sole ownership.

I therefore conclude that H. C. Childress did not own the shares of stock shown by the certificate, but that the same was assigned to him by Blunt to secure a loan, as Blunt testified, and hence that Blunt was the owner of all the shares in the warehouse company.

■ Finding that Blunt owned all the shares of stock in the Planters' Bonded Warehouse Company, and that it owed no debts or certainly none to any one other than Blunt, when he executed the deed to himself, then who could complain of its not being recorded? So when he made the mortgage to Mrs. McFaddin and the one to Fitts they certainly conveyed the equitable title to these parties. First National Bank v. Winchester, 119 Ala. 168, 24 So. 351, 72 Am. St. Rep. 904; Swift v. Smith, 65 Md. 428, 5 A. 534, 57 Am. Rep. 336.

■ I cannot see where section 7036 of the Code of Alabama has any application. In re V & M Lumber Co. (D. C.) 182 F. 231, 237; Nelson v. Hubbard, 96 Ala. 252, 11 So. 428, 17 L. R. A. 375.

It provides that all the property of a corporation may be disposed of when authorized by the directors and ratified by a vote of four-fifths in value of the stock.

Here I find all the stock was owned by Blunt at the time these mortgages were executed.

"One stockholder owning the whole capital stock could, of course, do what several stockholders could lawfully do." Button v. Hoffman, 61 Wis. 20, 20 N. W. 667, 669, 50 Am. Rep. page 133.

What is said as to these mortgages is equally true as to the mortgage to Taylor.

Taylor subordinated his mortgage to that of Fitts, and the one to Mrs. McFaddin was prior to that of Taylor, and hers was assigned to Fitts. So I find that Fitts as owner of these two mortgages has the first lien on the warehouse property.

In addition to this, as against the claim of the receiver of the bank, Taylor's mortgage was given to secure him for his signing as security of the bank to Hale county for its deposit in the bank.

As the bank could claim as against its surety no priority in the event he is called on to pay its debt, so its receiver can have no greater claim than the bank.

■ As to the claims of Mrs. Cryer, Mrs. Turnipseed, and E. P. Walsh, assignees of stock in the warehouse company by Blunt to secure them for money loaned by them to Blunt: I find that there was never a dissolution of the warehouse company. Ownership of all the stock of a corporation by one person does not dissolve such corporation. Button v. Hoffman, 61 Wis. 20, 20 N. W. 667, 50 Am. Rep. 131.

While Blunt claimed to own all the stock of the company and hence the property owned by it, he also claimed to keep up its corporate capacity, and when necessary assigned certain shares of stock so as to make an apparent corporate action.

He also paid a corporate tax.

He also used the corporate name whenever it suited his convenience.

The very fact of assigning the certificates of stock to these parties as security for the money he was borrowing from them was a most positive assertion of the continued corporate capacity of the company.

■ It was not the establishing of any lien on any particular property of the company, but was an assignment of such proportionate interest in its remaining assets as these shares bore to the whole number of shares after payment of the debts of the company, not to exceed the sum they were pledged for. Having found the company did not owe any debts, I therefore find that the holders of these assigned shares are entitled to be classed with the trustee in bankruptcy of Blunt as the owner of the balance of Blunt's shares next to the claims of Fitts and Taylor in the proceeds of the warehouse company.

■ It is urged that as these claims were not registered on the warehouse books as required by section 6995 of the Code of Alabama, they are bound by that section. This section only declares the failure to record transfers and pledges of stock void, "as to judgment creditors, or subsequent purchasers

without notice," and I find no such persons having adverse interests in this case. This section has no application to transactions between the parties. The trustee in bankruptcy is in neither class and his claim is no greater than that of Blunt, the bankrupt.

As to the $1,224.20, the sum paid in by the insurance company for the burning of the portion of the warehouse which was covered by the Fitts mortgage, the insurance policy provided loss, if any, payable to Frank Fitts as his interest may appear, should be paid to said Frank Fitts and credited by him on his mortgage.

As J. A. Blunt was declared bankrupt and not the Planters' Bonded Warehouse Company, the trustee in bankruptcy can only take such assets of this company as would fall to J. A. Blunt on a final settlement of the affairs of the warehouse company; hence if there is any balance remaining after a sale of the warehouse property and the settlement of the claims of Fitts and Taylor, such balance should be paid over to the trustee in bankruptcy and the assignment of the stock of Blunt according to their respective holdings.

"A legal distribution of the property after a dissolution of the corporation and settlement of its affairs is the inception of any title of a stockholder to it, although he be the sole stockholder." Ang. & A. Corp., § 779a; Button v. Hoffman, 61 Wis. 20, 20 N. W. 667, 50 Am. Rep. 133.

After the sale of the property and the settlement of the claim of Frank Fitts the balance of the proceeds of such sale shall be held until the contingent liability of H. A. Taylor is determined.

There is one other matter to be adjusted, and that is the leasehold claim of Clements & Clements, now the Greensboro Warehouse Company, Inc.

It appears that this lease was made in 1925 by J. A. Blunt, and the tenants put in possession, and have remained so to the present time.

This was before any of the rights set up by any of the claimants arose, and when Blunt was unquestionably solvent.

I therefore find this lease valid for its present term, and further that the rentals shall be paid over to the receiver of the bank as Blunt owned all the stock of the warehouse company, and it owed no debts at the time he assigned these notes to the bank.