[Nos. 2893, 2899, Sept. 26, 1925.]

# STATE TRUST AND SAVINGS BANK et al. v. HERMOSA LAND AND CATTLE CO.

# HERMOSA LAND AND CATTLE CO. v. STATE TRUST & SAVINGS BANK, et al.

## SYLLABUS BY THE COURT

1. Circumstances of a case may sometimes require a court of equity to ignore the separate entity of a corporation, and to look to the sole owner of its capital stock as the real party in interest.

2. In a contract of sale, tainted with constructive fraud. if the vendee elects to retain the property and recoup his damages, the doctrine of "unclean hands" cannot serve to deprive the vendor of the equitable remedy of foreclosure of the mortgage securing a part of the consideration.

3. A contract of sale specified, among other properties, "6,000 head of neat cattle, more or less, being all of the cattle owned by the H. L. & C. Co. and bearing one or more of the brands hereinafter set forth, and contracted to be conveyed." As an inducement to the sale the vendor surreptitiously paid to the vendee's agent having charge of the negotiations a substantial sum of money, held:

(1) While this language imports in law a mere estimate, it imports an estimate in good faith.

(2) If there is fraud or bad faith in making the estimate, the expression cannot be considered a mere estimate, but is to be treated as an actionable representation.

(3) The surreptitious dealing with the vendee's agent was a constructive fraud.

(4) Such constructive fraud has the same effect as actual fraud, negatives the essential element of good faith, in the estimate, leaving an actionable representation.

4. By waiving the right to rescind an executed contract of sale tainted with constructive fraud, the right of recoupment not necessarily waived.

5. Specific findings of fact, supported by substantial evidence, are conclusive on appeal.

6. Error in sustaining demurrer waived by answer over.

7. A contract of sale of ranches and live stock specified among the properties to be conveyed "250 miles of wire fence wherever situated." Proof that there was only 50 miles of fence, and that the vendee had, after taking possession, constructed certain 4-wire fence at a cost of $200 per mile, was insufficient to warrant substantial damages.

8. Review is for correction of erroneous result, rather than merely to approve or disapprove the gounds on which it is based.

9. Cause not reversed for error in refusing damages for shortage of fence contracted to be sold, on the ground of laches in making demand therefor, where the proofs of the amount of such damages were too uncertain to warrant allowance of substantial damages.

10. One recovering judgment on promissory notes, but reduced in amount by damages awarded in recoupment, is the "prevailing party" within the meaning of section 4282, Code 1915, and should recover costs.

11. Where judgment is rendered on promissory notes, but for a balance, after deduction of amount allowed in recoupment, an allowance of attorney's fees at the rate per cent. specified in said notes, computed upon such balance, is proper.

12. The fact that a demand is unliquidated is not conclusive against allowance of interest as damages from date of default.

13. In a suit for purchase price, where damages are awarded in recoupment because of shortage in cattle sold, an allowance of interest on the sum recouped from date of default in delivery, as damages, not erroneous, where the date of default is certain, and the demand is of a nature reasonably ascertainable in amount; there having been no objection to such allowance except that the demand was unliquidated.

Error to District Court, Sierra County; Owen, Judge.

Action by the State Trust and Savings Bank as trustee, and another, against the Hermosa Land & Cattle Company, in which defendant filed a claim in recoupment. Judgment for plaintiffs, and both parties bring error. Cases consolidated in proceedings in error. Reversed and remanded, with direction.

E. W. Dobson, of Albuquerque, for plaintiffs in error in No. 2893 and defendants in error in No. 2899.

John F. Simms, of Albuquerque, and Snyder, Henry, Thomsen, Ford & Seagrave, of Cleveland, Ohio, for defendant in error in No. 2893 and plaintiff in error in No. 2899.

WATSON, J. September 28, 1921, State Trust & Savings Bank, as trustee, and Anna W. Hopewell com-

menced suit against Hermosa Land & Cattle Company, a New Mexico corporation, upon three promissory notes bearing date August 11, 1917, in the principal sum of $25,000 each, maturing, respectively, October 1, 1920, October 1, 1921 and October 1, 1922, bearing interest at 6 per cent., and the usual provision for attorney's fees. These notes were given by Hermosa Land and Cattle Company to Willard S. Hopewell, trustee, and were secured by a mortgage given by this company to said State Trust and Savings Bank, as trustee, under its former corporate name of American Bank & Trust Company. In the lower court, defendant was allowed to recoup damages in the sum of $33,635, with 6 per cent. interest from the date of the notes, and judgment was rendered for plaintiffs for the difference between the principal and interest of the notes and the principal and interest of the recoupment, and for 10 per cent. of such difference as attorney's fees, for the amount of which judgment foreclosure of the mortgage was decreed. Both parties have brought the case here by writs of error; the cases, Nos. 2893 and 2899, having been consolidated. The parties will be referred to herein as plaintiff and defendant as in the court below.

Some time prior to the execution of the notes and mortgage, Mr. J. A. Wigmore, then residing in New York, desiring to purchase a ranch and cattle, became acquainted with W. G. Hamilton, whom he commissioned to find a ranch for him. Among the properties examined by Mr. Hamilton were those of the Hermosa Land & Cattle Company, situated in Sierra county, N. M. At that time plaintiff Hopewell was the majority stockholder in defendant corporation, of which Col. W. S. Hopewell, her husband, was the president.

As the result of negotiationss between Col. Hopewell representing the defendant corporation, and Hamilton, representing Mr. Wigmore, a contract was signed on June 20, 1917, by defendant corporation, by Col. Hopewell as its president, and by Wigmore, by Hamilton, his agent. The contract provided for the sale by the de-

fendant corporation and the purchase by Wigmore of the ranches and cattle of the corporation for $225,000, of which $10,000 was to be and was paid in cash, and $90,000 was to be paid upon the delivery of abstracts showing good title to the lands. The deferred payments were to be represented by five promissory notes of $25,000 each, maturing one each year for five years thereafter, and to be secured by mortgage on the property conveyed.

The title to said property proving satisfactory, and the $90,000 having been paid, Mr. Wigmore, through Hamilton, his agent, interposed the objection that he did not wish to give his personal notes for the unpaid purchase price, and it was thereupon agreed that, instead of a conveyance of the properties in question from the corporation, Wigmore should receive transfer of all of the corporate stock of the corporation, and that thereupon the notes and mortgage in question should be executed by the corporation. This agreement was carried out, and the notes were made payable to W. S. Hopewell, as trustee, for the old stockholders. From that time until the trial, Mr. Wigmore remained the holder and owner of all the stock of defendant corporation, except two shares held by others that they might qualify as directors.

While negotiations were proceeding between Hopewell and Hamilton, the former paid to the latter a substantial sum of money, about $10,000, as an inducement to bring about the sale. Hopewell had knowledge of Hamilton's agency for Wigmore, but Wigmore had no knowledge of this payment to Hamilton.

The first two of the notes were paid at about the time they matured, together with the accrued interest on all of the notes, but, when the third note matured on October 1, 1920, and payment was demanded, it was refused; it being claimed that, by reason of false representations as to the number of cattle and the quantity of fence, damages had been suffered which must be adjusted before further payments would be made. Be-

fore the maturity and payment of the second note, Mr. Wigmore had learned of the payment of the commission to his agent, and had become satisfied that there was a substantial shortage of cattle, and, as the trial court found, knew, or should have known, that there was a shortage of fence. Mr. Hopewell died August 13, 1919, prior to which time Wigmore had made claim that there was a shortage of cattle, but had never mentioned any shortage of fence; no claim as to the fence having been made until about 2½ years after the date of the contract. Further facts and the contentions of the parties will be hereinafter stated.

The written contract out of which this litigation arises was in form an agreement by Hermosa Land & Cattle Company to sell to J. A. Wigmore certain ranch properties, improvements and cattle. However, in closing the trade it assumed a different form. There was no conveyance of the properties, the subject-matter of the original contract; but, instead, all of the capital stock of the corporation was transferred to Wigmore. The deferred payments, originally to have been represented by Wigmore's notes and secured by mortgage on the properties to have been conveyed to him, were, in the closing, represented by the notes of the corporation and secured by its mortgage on the properties, the legal title to which was not affected by the transaction.

From the form which the transaction finally assumed, as just stated, counsel, respectively, claim far-reaching results. Defendant contends that, since the corporation received nothing which it did not already possess, there was no consideration for the notes it gave or for the mortgage which it placed on its assets. It contends that the consideration of the notes and mortgage was the transfer of the stock to Wigmore, and that it was ultra vires the corporation to agree to pay his individual debt. On the other hand, it is contended by plaintiffs that, since the assets of the corporation were exactly the same, after as before, the transfer of the stock, any false representations concerning those assets worked no damage to the corporation, but affected

only the value of the stock, and damaged Wigmore
only, and that his damage is not to be considered in a
suit solely against the corporation.   They contend also
that it was the corporation that made the representa-
tions, through Col. Hopewell, its president, and that,
if Wigmore has suffered damage through their falsity,
his cause of action is against the corporation.   If such
are the necessary results of the transaction, it is appar-
ent that the parties have involved themselves in a legal
maze which it is hardly to be supposed they intended,
and from which it will be difficult, if not impossible
to extricate them.

Before proceeding to consider the principle which we
think is controlling of these several contentions, let us
take note of the substantial rights and the practical
situation of the parties.   The real subject-matter of the
trade was the ranches, improvements, and cattle.   While
the title to this property did not change, the control
and beneficial enjoyment did.   Wigmore wanted to buy
a ranch.   Col. Hopewell wanted to sell one.   Those
objects were accomplished in practical effect.   The
trade assumed the final form it did simply because of
Wigmore's objection to becoming personally liable for
the deferred payments.   The transfer of the stock in-
stead of the properties was a device to eliminate such
liability.   We think it may be safely said that the par-
ties at least tacitly agreed that Wigmore should not
be individually liable.   If that is true, and the plain-
tiffs cannot recover from the corporation because of
lack of consideration or because its promise was ultra
vires, and cannot recover from Wigmore because his
liability is excluded by the contract, from whom may
they colllect the deferred payments?   On the other
hand, may plaintiffs urge in the same breath that the
transfer of the stock to Wigmore was consideration for
the corporation's notes and mortgage, and that dam-
ages which Wigmore suffered through false represen-
tations affecting the value of that stock is not a partial
failure of that same consideration, which may be re-

couped? All of these difficulties grow out of the doctrine that a corporation is an entity, distinct in the eyes of the law from the person or persons who, for the time being, own its stock. That doctrine, in its general application, is not to be questioned. Convinced, however, that it trammels the doing of equity in this case, we are led to inquire whether it is universal in its operation. If we may ignore it, and say that really Wigmore purchased these properties, became the owner of them, and pledged them to the former owners for the balance of the purchase money, and that really he is being sued here for the enforcement of that pledge and that in such suit he is seeking to recoup the damages he claims to have suffered because of false representations or breach of warranty, then we have disposed of all these troublesome questions so ably and ingeniously presented by counsel, and which stand in the way of, or seriously embarrass, an equitable adjustment of the rights of the parties.

[1] We find at once that a court of equity is not always bound to regard the legal status of a corporation as an existence in itself, regardless of its stockholders. In Cook on Corporations, §6, it is said:

" * * * A corporation is an entity, an existence, irrespective of the persons who own all its stock. * * * But there are occasions where the courts will ignore the corporate existence and will hold that its acts are the acts of its stockholders and vice versa the same as in a partnership. * * * The New York Court of Appeals have said: 'We have of late refused to be always and utterly trammeled by the logic derived from corporate existence where it only serves to distort or hide the truth.' "

In Thompson on Corporations, § 10, it is said:

"The proposition that a corporation has an existence separate and distinct from its membership has its limitations. It must be noted that this separate existence is for particular purposes. It must also be remembered that there can be no corporate existence without persons to compose it; there can be no association without associates. This separate existence is to a certain extent a legal fiction. Whenever necessary for the interests of the public or for the protection or enforcement of the rights of the membership, courts will disregard this legal fiction and operate upon both the corporation and the persons composing it."

In Fletcher Cyc. Corp. vol. 1, p. 56, it is said:

"Practically all authorities agree that in certain cases and at certain times a corporation is to be regarded as a legal entity and personality. There is also substantial agreement that at certain times the fiction of corporate entity is inapplicable. Sometimes a corporation is looked upon as a unit, at other times as a collection of persons. The doctrine of separate existence may be carried too far, and it is properly disregarded in cases of fraud, circumvention of contract or statute, public wrong, monopoly and like instances. 'If any general rule can be laid down, in the present state of authority, it is that a corporation will be looked upon as a legal entity as a general rule, and until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or defend crime, the law will regard the corporation as an association of persons' (citing U. S. v. Milwaukee Refrigerator Co. [C. C.] 142 F. 247). It has been aptly said: 'This distinction between a corporation as being an impalpable entity, and the corporaton as being the living persons of whom it consists, is for many purposes a substantial distinction, necessarily involved in the creation and use of corporations, but for some purposes it is not only a fiction, but a useless and unreasonable fiction; and it is a settled principle that in certain cases where the fiction can serve no purpose but to accomplish injustice, and to screen the corporation from the just consequences of its wrongs, the court will not permit this legal fiction to prevail against real substance'—citing Starr Burying Ground Ass'n v. North Lane Cemetery Ass'n, 77 Conn. 83, 58 A. 467."

Again, in Cook on Corporations, §§ 663, 664, after alluding to exceptions to the general rule that a corporation is a legal entity, the author says:

"The chief application of this statement of law is in cases of fraud, but there is a line of cases which apply this rule where there is no fraud, and where the owner of the stock is held liable merely because he owns all the stock of the corporation."

The Supreme Court of Nebraska, in an able opinion, after reviewing many authorities, formulated the following rule, to be applied in the case before it:

"Where a corporation is proceeding at law, or where it is asserting a title to property, or the title to property is involved, the corporation is regarded as a person separate and distinct from its stockholders, or any or all of them. But where it is proceeding in equity to assert rights of an equitable nature, or is seeking relief upon rules or principles of equity, the court of equity will not forget that the stockholders are the real and substantial beneficiaries of a re-

covery, and if the stockholders have no standing in equity, and are not equitablly entitled to the remedy sought to be enforced by the corporation in their behalf and for their advantage, the corporation will not be permitted to recover." Home Fire Ins. Co. v. Barber, 67 Neb. 644, 93 N. W. 1024, 60 L. R. A. 927, 108 Am. St. Rep. 716.

The principles applied in the foregoing case are quite suggestive as to the proper disposition of the present case. It was in part a suit by a corporation to recover from a former stockholder and manager for illegitimate profits made by him in dealing with the corporation funds. The then stockholders had acquired their stock from the defendant, and had paid therefor what it was actually worth in view of the financial condition of the company at the time of the transfer. In the court's view, a recovery would have been inequitable because (1) it would have resulted in giving to the then stockholders benefits and values for which they had not bargained and had not paid, and (2), at the time when defendant was illegally profiting at the expense of the corporation, he was himself the owner of a large amount of its stock, and thus was appropriating, proportionately to such ownership, what was in reality his. There was an undoubted wrong to the corporation viewed as an entity. If there had been any stockholders who were such when the wrong was committed, thus suffering from it, the result must have been different. In such case there would have been no escaping the legal status of the corporation as an entity. But, there being none such, and, as the recovery by the corporation would result in unearned and undeserved advantage to its stockholders, and in doubly penalizing the defendant, it was deemed a proper occasion for ignoring the corporate organization. A further quotation from the opinion will perhaps be instructive:

"To permit persons to recover through the medium of a court of equity that to which they are not entitled, simply because the nominal recovery is by a distinct person through whom they receive the whole actual and substantial benefit, and that nominal person would, in ordinary cases, as representing beneficiaries having a right to recover, be entitled to

relief, is a preversion of equity. It turns principles meant
to do justice into rules to be administered strictly without
regard to the result.    It is contrary to the very genius of
equity.    When the corporation comes into equity and seeks
equitable relief, we ought to look at the substance of the pro-
ceeding, and, if the beneficiaries of the judgment sought
have no standing in equity to recover, we ought not to be-
come befogged by the fiction of corporate individuality, and
apply the principles of equity to reach an inequitable result."

In a California case, one Rowley had, by way of re-
newal of his own note, made and delivered the note of
a corporation. Later he became the executor of the
payee, by reason whereof, under the California statute,
he became chargeable in the inventory with the amount
of any indebtedness to his testator. At the time of
suit, the note, as against the corporation, was barred by
limitation, but, if there was any liability on the part
of Rowley it was not barred, because of the change in
the character of his obligation due to his intervening
fiduciary capacity. The court said:

"Before the acts and obligations of a corporation can be
legally recognized as those of a particular person, and vice
versa, the following combination of circumstances must be
made to appear: First that the corporation is not only in-
fluenced and governed by that person, but there is such a
unity of interest and ownership that the individuality, or
separateness, of the said person and corporation has ceased;
second, that the facts are such that an adherence to the fic-
tion of the separate existence of the corporation would, under
the particular circumstances, sanction a fraud or promote
injustice."

After determining that the first requirement had
been met, and in discussing the second, the court said:

"It is not necessary, as defendants contend, that the com-
plaint allege actual fraud; it is sufficient if the facts set forth
disclose that the dealings were in form with a corporation
but in reality with an individual and that a refusal to recog-
nize this fact will bring about inequitable results."

and held that Rowley could not "avoid the incidents
of his fiduciary relationship solely by reliance upon the
fiction of the independent existence of an organization
which was in effect nothing more than a form assumed
by him in his business dealings." Minifie v. Rowley,
187 Cal. 481, 202 P. 673

In Pott v. Schmucker, 84 Md. 535, 36 A. 592, 35 L. R. A. 392, 57 Am. St. Rep. 415, it was held that the trustee of an insolvent banking house could not participate with other creditors in the proceeds of the sale of the assets of an insolvent corporation of which one of the banking partners was the sole stockholder. The court first demonstrated that if the overdraft upon which the claim was based had been the individual obligation of the partner, and the partner insolvent, the firm could have no claim upon the assets of the insolvent partner until after satisfaction of his other creditors. It then declared:

"We need not go beyond the limits of Maryland for adjudged cases sustaining the right of a creditor or others in an appropriate case and in furtherance of the ends of justice, to treat the debtor corporation and the individual owning all its stock and assets as identical."

In Swift v. Smith, 65 Md. 428, 5 A. 534, 57 Am. Rep. 336, the doctrine was announced that the sole owner of the capital stock of a corporation was in equity the owner of its assets and that his individual act in mortgaging them was good in the absence of prejudice to creditors. This is an extreme view. It is doubtless out of line with the weight of authority. In Home Fire Ins. Co. v. Barber, supra, it was commented upon as follows:

"The case of Smith v. Smith has been criticized, as we think with some reason, so far as it deals with the sole stockholder as if he had some title to the property. But, so far as it sustains the proposition that, between the corporation and the stockholder, the latter is to be recognized as the real beneficiary, and consequently that equitable rights and remedies, the benefit thereof would inure solely to the shareholder, are to be regarded as exercised by him for the corporation, and not as something belonging to it independently, the decision is in accord with the authorities."

In Southern Pac. Co. v. Bogert, 250 U. S. 483, 39 S. Ct. 533, 63 L. Ed. 1099, the Supreme Court of the United States, in order to do equity, recognized the substantial identity of two corporations, one of which owned all of the capital stock of the other.

In Chicago, M. & St. P. R. Co. v. Minneapolis C. Q C. Ass'n, 247 U. S. 490, 38 S. Ct. 553, 62 L. Ed. 1229, it was held that—

"Where stock ownership has been resorted to, not for the purpose of participating in the affairs of a corporation in the normal and usual manner, but for the purpose, as in this case, of controlling a subsidiary company, so that it may be used as a mere agency or instrumentality of the owning company or companies, * * * the courts will not permit themselves to be blinded or deceived by mere forms of law, but, regardless of fictions, will deal with the substance of the transaction involved as if the corporate agency did not exist and as the justice of the case may require."

See also, Southern Pac. Co. v. Lowe, 247 U. S. 330, 38 S. Ct. 540, 62 L. Ed. 1142; Perkins v. Trinity Realty Co., 69 N. J. Eq. 723, 61 A. 167; Norma Mining Co. v. Mackay, 241 F. 640, 154 C. C. A. 398; Ark. River Land, Town & Canal Co. v. Farmers' Loan & Trust Co., 13 Colo. 587, 22 P. 954.

The cases in which corporate organization was resorted to to accomplish fraud, or to defeat public justice or to circumvent statutes, are numerous, but they need not be cited. The foregoing are illustrative merely of situations more or less similar to that in the case under consideration, where the courts have looked beyond the corporate entity, not because it was fraudulent in itself, but merely because to recognize it in the particular case would result inequitably.

[2] Defendant contends that plaintiffs are not entilted to equity, either generally, or with respect to the special defenses of lack of consideration and ultra vires, because their hands are unclean by reason of the fraudulent representations made, and of the accomplishment of their fraudulent purpose through corruption of Wigmore's agent. "This, then," they say, "is the theory of our defense: That legally there was no consideration for the notes and mortgage sued upon; legally the defendant was not authorized to execute these notes and mortgage here in question, and its attempt so to do is ultra vires; and, morally, because of the uncleanness of the hands of these plaintiffs, because of the iniquit-

ous conduct 'inseparably connected with' the subject-matter of this suit, the plaintiffs should not be heard to say that we are seeking to avoid their claim on purely technical grounds, but that equity and good conscience demand that these plaintiffs be left to whatever remedies at law they may have, and to no other.''

The doctrine of ''unclean hands'' is well established and not to be questioned when invoked in a proper case. Its usual application is to defeat enforcement or cancellation of a contract originating in iniquity, frequently a promise to reconvey property conveyed without consideration and in fraud of creditors. But there is no iniquity inherent in this contract. The sale of the property, either by conveyance or by transfer of the shares, and the giving of the notes and mortgage, are all legitimate. The claims of fraud relate merely to representations as to the value and quantity of the property and to the dealing with the buyer's agent, whereby the buyer was deceived as to these matters. These claims are substantial, but they relate to incidental and collateral matters. True, they are sufficient to have vitiated the whole contract had defendant chosen to rescind, but it did not so choose. It has affirmed the contract, thus limiting itself to such remedies as equity affords under such circumstances. It cannot retain the benefits and at the same time repudiate the consideration. It seems plain that there is no case here for the application of the doctrine of ''unclean hands.'' Indeed, we do not understand defendant to urge seriously that it should be applied to the extent of barring plaintiffs from the relief of foreclosure, but rather that it should have effect to let in their defenses of ultra vires and lack of consideration. We have indicated our views as to the equitable principle which should govern with respect to these defenses. We hold that we should ignore in this case the legal distinction between the defendant corporation and Mr. Wigmore, the owner of all its stock, and treat them as identical. Therefore we overrule defendant's exceptions to the sustaining of the demurrers to its defenses of ultra vires and lack of con-

sideration, and for the same reason overrule plaintiffs' exceptions to the overruling of their motion to strike the defense of recoupment.

[3] A part of the property which we have found to be the real subject-matter of the contract was a herd of cattle described in the contract as follows:

"Six thousand (6,000) head of neat cattle, more or less, being all of the cattle owned by the Hermosa Land & Cattle Company, and bearing one or more of the brands hereinafter set forth, and contracted to be conveyed."     ,

Defendant claimed that there were less than 6,000 cattle in the herd at the time of the transaction, and was allowed by the trial court to recoup for the shortage. Plaintiffs contend that the language does not, in law, import a warranty, as to the number of the cattle, but merely an estimate. They cite a number of cases, relying particularly on Day v. Cross, 59 Tex. 595, and U. S. v. Brawley, 96 U. S. 168, 24 L. Ed. 622. These cases undoubtedly support the contention, and we will assume that they correctly state the rule.

Defendant, while admitting that the language used imports no more than an estimate, contends that it imports a good-faith estimate, and that, in the absence of good faith, or fraud being present, we have, instead of a mere estimate, an actionable representation. It points out that in both cases, supra, relied upon by plaintiffs, as well as in the authorities cited, good faith in the stating of the estimate is presupposed. With this rule we are compelled to agree. Neither the words "more or less," nor the fact that the sale was in gross can preclude inquiry as to whether there was fraud or deceit in the representations as to the number of the cattle. Dargan v. Ellis, 81 Tex. 194, 16 S. W. 789; Leicher v. Keeney, 98 Mo. App. 394, 72 S. W. 145. Admitting that the language used imports an estimate, it cannot be maintained that the agreement of the parties simply to estimate the number gives license to the seller to estimate it falsely. In fact, as we conceive, if he did not give the buyer the benefit of his honest

judgment in the matter, it cannot be said that he estimated them.

We are convinced, therefore, that, if there was a willful misrepresentation of Col. Hopewell's honest judgment as to the number of the cattle, the language used in the contract does not stand in the way of relief. The trial court, however, refused to find that Col. Hopewell intended "to willfully perpetrate a fraud." He did find that Col. Hopewell knew that Hamilton was Wigmore's agent in the purchase of the ranch property, and that Hamilton received from Hopewell a substantial sum of money, about $10,000, as an inducement to bring about the sale. The question is whether this conduct, known as "double dealing" by the agent, to which the seller was a party, when shown, precludes the plaintiffs from claiming that there was no representation as to the number of cattle, but a mere estimate.

There is no more effective means of committing a fraud in a case of this kind than to corrupt the buyer's agent. The buyer relies upon the judgment and watchful care of his agent to protect his interests. In the transaction of purchase and sale, each party seeks a bargain. An agent cannot serve both parties, because in serving one he betrays the other. Mr. Wigmore had a right to expect fidelity. Hamilton had no right to sell it, nor Col. Hopewell to buy it. Conceding that Col. Hopewell's estimate was honest, Wigmore did not rely upon that alone, but thought he was receiving the benefit of the honest judgment of his agent. If that judgment had been left free from corrupting influences, Hamilton's estimate of the number of cattle might have differed materially from that of Hopewell.

The authorities leave no doubt that a surreptitious dealing between one principal and the agent of the other is a constructive fraud on the latter which courts will not countenance. Mechem on Agency, §§ 2137, 2138, and 2139; Clark and Skyles, Agency, § 553; Pan-

ama, etc., Tel. Co. v. Indian Rubber, etc., Co. L. R. Ch. App. 515; Atlee v. Fink, 75 Mo. 100, 42 Am. Rep. 385; Harrington v. Victoria Graving Dock Co., [1877-78] 3 Q. B. Div. 549; Shipway v. Broadwood, [1899] 1 Q. B. 369; Bollman v. Loomis, 41 Conn. 581; Miller v. Louisville R. Co., 83 Ala. 274, 4 So. 842, 3 Am. St. Rep. 722; Henninger v. Heald, 52 N. J. Eq. 431, 29 A. 190; Jacobs v. George, 2 Ariz. 93, 11 P. 110; City of Findlay v. Pertz, 66 F. 427, 13 C. C. A. 559, 29 L. R. A. 188; Fish v. Leser, 69 Ill. 394; Alexander v. Weber, [1922] 1 K. B. Div. 642.

But plaintiffs contend that, since defendant recog-nized and affirmed the contract by paying one of the notes after discovery of the fraud, it has waived, not only its right to rescind, but the right to rely upon the fraud, either offensively or defensively. They contend particularly that, the fraud having been waived, it cannot have the effect to destroy the quality of the language under consideration as a mere estimate.

[4] On the other hand, defendant contends that its optional and defensive remedy of recoupment cannot be deemed waived merely by its failure to resort to its other optional but affirmative, remedy of recission.

Plaintiffs quote from Black on Recission and Cancellation, § 590, passages which, on reading, seem to support their broad contention that fraud, once waived, is waived for all purposes. A reading of the context and of the numerous cases cited by the author leaves us in doubt as to the meaning of the text. It is plain, however, that the decisions cited lend no support to plaintiffs' position.

Plaintiffs also cite Alger v. Anderson (C. C.) 92 F. 696; McLean v. Clapp, 141 U. S. 429, 12 S. Ct. 29, 35 L. Ed. 804; Grymes v. Sanders, 93 U. S. 55, 23 L. Ed. 798. The former merely holds that in a suit for recission of a contract for the purchase of land, or, in the alternative, for damages for breach of covenant of warranty of title, if it be found that the remedy of rescis-

sion is not available because of election to abide by the transaction after knowledge of the fraud, the court of equity may not entertain the claim for damages, because such claim is the proper subject of a suit at law. The latter cases merely hold that one may not have the remedy of rescission after having once waived it.

The question of jurisdiction in equity, decided in Alger v. Anderson, supra, is of course of no importance in this state, where legal and equitable remedies are available in the same court and cause. Nor are other federal cases favorable to plaintiffs' contention. Richardson et al. v. Lowe et al., 149 F. 625, 79 C. C. A. 317; Friedricksen v. Renard, 247 U. S. 207, 38 S. Ct. 450, 62 L. Ed. 1075.

Doubtless a purely executory contract may be so ratified by performance after discovery of the fraud as to effect a waiver of damages. See cases reviewed in note: "Waiver of Right of Action for Damages for Fraud or Deceit." L. R. A. 1918A, 106. Some cases apparently hold that continued performance of an executed contract, after discovery of fraud, constitutes waiver of right of action therefor; but these seem to be opposed to the weight of authority. We know of no authority for plaintiffs' broad position that fraud, once waived as a ground for rescission, is no longer available for any purpose.

"When a party, after the making of a contract, but before its performance, discovers the fraud of the other, and still goes on and performs his part, he is thereby precluded from the equitable remedy of cancellation, and also from the remedy of recovering back the consideration, but not from the legal remedy of damages for deceit." Pomeroy's Eq. Juris., § 897, note 1.

"A party who has knowledge that he has been defrauded and yet subsequently confirms the original contract by making new agreements or engagements respecting it, or by any acts which manifest an intention of treating it as a valid subsisting contract, thereby waives the fraud and abandons all claim to equitable relief based on the fraud. * * * Where a party is injured by fraudulent representations, his accepting and holding on to the property concerning which the fraudulent representations have been made, after ascertaining their falsity, produce neither a waiver nor does it operate

as an estoppel to prevent his suit for damages. He waives nothing by accepting what is offered, although not what he traded for." Smith on the Law of Fraud, § 136.

It has been said many times that, in case of such constructive fraud as we have here in question, the wronged principal may rescind, or if he choose to ratify, may have such other relief as equity affords. Mechem on Agency, § 2137; Clark and Skyles, Agency, § 553; Panama, etc., Tel. Co. v. Indian Rubber, etc., Co., supra; Kuntz v. Tonnele, 80 N. J. Eq. 373, 84 A. 624; Cunningham v. Holcomb, 1 Tex. Civ. App. 331, 21 S. W. 125; City of Findlay v. Pertz, supra; Alexander v. Webber, supra. And in many cases recovery of damages has been allowed. Mayor, etc., of Salford v. Lever [1891] 1 Q. B. Div. 168; City of Boston v. Simmons, 150 Mass. 461, 23 N. E. 210, 6 L. R. A. 629, 15 Am. St. Rep. 230; Kuntz v. Tonnele, supra; Herringer v. Heald, supra. Actions will lie against both the corrupted agent and the corrupting principal. Mayor, etc., of Salford v. Lever, supra; Glaspie v. Keator, 56 F. 203, 5 C. C. A. 474. It is immaterial whether the bribe actually induces disloyalty of the agent to his principal. Harrington v. Victoria Graving Dock Co., supra; Shipway v. Broadwood, supra; Henninger v. Heald, supra; Jacobs v. George, supra; note to Potter's Appeal, 7 Am. St. Rep. 281; City of Findlay v. Pertz, supra; N. Y. Cent. Ins. Co. v. National Protective Ins. Co., 14 N. Y. 85.

"Constructive fraud is merely a term applied to a great variety of transactions, having little resemblance either in form or in nature, which equity regards as wrongful, to which it attributes the same or similar effects as those which follow from actual fraud, and for which it gives the same or similar relief as those granted in cases of real fraud." Pomeroy's Eq. Jur. § 922.

We therefore hold that, upon the establishment of the constructive fraud, the requisite element of good faith disappears. The language in question becomes a representation rather than an estimate, and defendant may recoup for any shortage which it can establish.

The trial court found that 5,039 head of cattle were delivered under the contract, a shortage of 961 head,

for the value of which defendant was allowed damages in recoupment. Both parties assign error.

The court, at plaintiffs' request, found:

"(17)   The court finds from the evidence the rule or ratio of calves branded to the whole number in the herd, as 1 to 4, and adopts such as the fact, so far as it applies to the Hermosa ranches.

"(18)   The court further finds from the evidence, that the total number of calves branded for the year 1916, and tallied during said year, and to the end of the year 1916, was 1,123 head.

"(19)   That during the year 1916, the reports of the cattle sanitary board show that there were 388 head of cows and calves shipped during the year 1916, which number should be deducted from the total number in the herd.

"(20)   The court further finds that during the year 1917, up to the date of the execution of the notes and mortgage, there were 935 calves branded, which number should be added to the number in the herd as heretofore found."

The court refused plaintiffs' requested finding No. 21, as follows:

"(21)   From the facts found in findings Nos. 17, 18, 19, and 20, the court further finds that, at the close of the year 1916, there were 4,492 head of cattle of all kinds, ages, and sexes in the herd, and, adding thereto the calf crop of 1,123 head, amkes the total of 5,616 head, and deducting therefrom 388 head, the number sold during the year 1916, would leave 5,227 head, and then adding thereto the calves branded in 1917 up to the time of the execution of the notes and mortgage, as found by finding No. 20, which was 935 head, would make the herd at said time consist of 6,162 head."

Plaintiffs contend that, admitting findings 17, 18, 19, and 20, there is no escaping requested finding 21. The result reached by the plaintiffs varies from that reached by the court because of a difference in their interpretations of finding 17. Plaintiffs urge that the ratio of 4 to 1 is that between the branded calves and the adult animals in the herd, while the court applied the ratio, just as stated in the finding, to the whole number in the herd. Both base their computations upon 1,123 calves of 1916. Multiplying this number by 4, the court determines the whole number in the herd at the close of 1916 as 4,492. Plaintiffs insist that

this number represents only the adult cattle, to which the 1,123 calves must be added. Thus they support their claim of 5,615 head in the herd at the close of 1916.

Plaintiffs contend that the lower court overlooked and forgot to add in the 1916 calves. They urge that this mistake or error is so plain, and can be so mathematically demonstrated, that we should correct it here. That the court did not inadvertently act we are satisfied. In his written opinion he sets out his computation, disclosing every step. He refused requested finding 21, based upon plaintiffs' theory, and plaintiffs excepted. While plaintiffs' proposed finding 17, they say in their brief that it is based on the court's written opinion. The court, of his own motion, made this finding:

"That all the findings of fact in this cause, made by the court upon the request of either of the plaintiffs or the defendant, are intended to be taken in conjunction with the written opinion of the court filed in this cause, which is hereby adopted as a finding of fact and a conclusion of law upon the matters therein covered."

In his opinion he said:

"The court is asked by the defendant to determine the fact as to the number of cattle, by means of the application of a rule claimed to be customarily used by cattle growers in this locality—of multiplying the annual average calf crop over a period of years by 3, or the average annual steer sales by 6, or the whole number of the herd upon a cattle range being operated as a going concern. *   ** The court is of the opinion that the statements of the witnesses of the several parties, rather than be taken as antagnostic to each other, may be harmonized by adopting the ratio of calves branded to the whole number of the herd, as 1 to 4, and adopts this as a fact." ,

Since the language used, "the whole number of the herd,"[1] is sufficient to include the calves, it would seem that, if there was inadvertence, it was not of the court in applying its own rule, but of plaintiffs in accepting it and proposing it as a finding. That plaintiffs were themselves confused as to the rule claimed is clear from an analysis of their proposed finding 21.

They ask the court to find "that at the close of the year 1916, there were 4,492 head of cattle of all kinds, ages, and sexes in the herd." That is exactly what the court did find by multiplying 1,123 branded calves by 4. If all kinds, ages, and sexes were already included, why should calves be included again?

Plaintiffs contend that the testimony shows conclusively that the witnesses who testified to the 3 to 1 rule meant thereby that 3 adult animals would produce one calf, and that, when the court adopted the 4 to 1 rule he must be held to have meant that, on the Hermosa ranches, 4 adults would produce one calf. The court, as seen, did not say so in his opinion nor in finding 17. He correctly applied the rule which he expressed. It might be urged, of course, that plaintiffs are concluded by having proposed finding 17. Technically, they should have excepted to it. But, waiving that, the court did not apply the 3 to 1 rule. He determined that it fell "far short from being customarily applied." He adopted a rule of his own, "harmonizing" the statements of witnesses, and taking into consideration "the variations in climatic conditions on the Hermosa range itself, the diversity between it and adjacent ranges, the wide difference in annual calf or steer crops, and the differences in productivity between the so-called lowlands and mountain districts, with the fluctuating number of cattle in each as testified to, with the many other elements which may enter into the theory for the rule." Admitting that those who supported the 3 to 1 rule by their testimony would add the calves to the quotient to determine the whole number in the herd, it does not folllow that the court, after rejecting the rule, as not established as of general application, and as not applicable to the particular conditions shown to exist in the case, must be held to the same interpretation of his own rule. If the court had adopted the 3 to 1 rule, and had then applied it contrary to the evidence as to its meaning, the question would be different.

The 4 to 1 rule, as applied by the court, results exactly as would the 3 to 1 rule as applied by the plaintiffs. While the court rejected the 3 to 1 rule, he said that the evidence supporting it was "impressive." References by plaintiffs to the evidence indicate that it was at least substantial. It is thus inferable that, if the court had adopted the 3 to 1 rule with the interpretation contended for, thus reaching the same result, it would have been unimpeachable because sustained by substantial evidence.

[5] Defendant, on the other hand, complains that the real shortage was much greater than the court found. Its computation is based upon testimony tending to show the ratio between calves branded and adult female stock, and reaches a result nearly 1,000 greater than the shortage found by the court. The evidence to which defendant directs our attention would perhaps have supported the finding of such a shortage. However, on conflicting evidence, the court found otherwise. Such finding, being supported by substantial evidence, is controlling here.

We conclude, therefore, that all objections to the amount allowed in recoupment on account of shortage in cattle must be overruled.

The trial court disposed of the claim of recoupment on account of shortage of fence by holding that, because of delay in complaining and of continued performance after discovery, all damages arising therefrom were barred by laches or waiver.

The refusal to allow damages on this account is complained of by defendant on three grounds, which we now consider.

[6] It is first urged that the court erred in sustaining plaintiff's demurrer to the answer on the ground that it did not allege sufficient diligence in discovering and complaining of the alleged shortage. The defendant answered over, thereby waiving the error, if any there was. Rogers v. Crawford, 22 N. M. 671, 167 P. 273.

[**7**] It aso urges that the court erred in his finding of laches or waiver, contrary to the evidence; and, as matter of law, in refusing to allow recoupment based on findings 16 and 17, made at defendant's request, which findings are as follows:

"(16) At the time of the making of the said contract and the transfer of the management of the defendant company to said J. A. Wigmore, there was not more than 50 miles of fence, the property of the defendant company upon said company's ranch and range.

"(17) The actual cost of construction of said fence at said time was about $200 per mile."

[**8**] Our review is for the correction of an erroneous result, rather than merely to approve or disapprove the grounds on which it is based. Hayne, New Trial and Appeal § 284. Should we reverse the cause, holding that the court erred in respect to his conclusion of laches or waiver, it must be remanded for the purpose of fixing the damages. If the record does not warrant damages, it would be idle to reverse. We pass, therefore, to the latter question, assuming, for the purpose of the discussion, that the court did err in respect to the former.

The question was raised at the argument as to the proper measure of damages; whether, as plaintiffs claim, the difference in the value of the ranches with and without the fence, or, as defendant claims, the cost of supplying the missing fence. This we think may be disregarded.

[**9**] In addition to the findings we have the fact that the contract of sale included "250 miles of wire fence, wherever situated." Does this record furnish any data for fixing damages? The literal effect of the findings is that at the date of the transfer of the property there was not more than 50 miles of fence, the actual cost of construction of which, at that time, was about $200 per mile. This, of course, gives us no basis for an estimate of the cost of construction, or of the value to the real estate, of 200 miles of imaginery

and undescribed fence. It seems to be fairly agreed, however, that the findings are based upon evidence tending to show, not the cost of the 50 miles of existing fence, but of other 4-wire fence constructed by defendant after the transfer. For present purposes we may give defendant the benefit of such construction of its findings. It is still apparent that there is uncertainty not that damages result from the breach, but as to the amount of damages compensatory of it. If the lower court had awarded substantial damages on this record, could we have sustained him?

There is inherent difficulty due to infirmity in the contract. There is no stipulation as to the number of wires, the frequency of posts, the age of the fence, nor its condition of repair or delapidation. A 3-wire fence 25 years old, with infrequent and decaying posts, would have met the terms to which the parties agreed. Of what avail, then, to show merely the cost of constructing a new 4-wire fence? Suppose the contract had called for a house. Would it, in such a case, be permissible to base damages on a showing that there was no house and that the purchaser had expended $10,000 in erecting one?

We find no case decided in this jurisdiction dealing with the question of uncertain damages for breach of contract. But, in Palma et al. v. Weinman et al., 15 N. M. 68, 103 P. 782, an action in tort, by a tenant, a merchant, to recover from his landlord for an eviction, it was held that there was not sufficient evidence to sustain a verdict for loss of profits. The court thus described the evidence:

"There is, however, no evidence of loss of profits except the bald statement of the witness Ruppe as to the net profit per month during the time he occupied the Weinman premises, and at the location to which he removed his stock after the wall fell. True, the record shows that he referred to some memorandum to refresh his memory, but it nowhere appears what the memorandum was, nor when or by whom it was made; nor does he state that he knows or even believes it to be correct."

It seems to us that the evidence in the case at bar is no more satisfactory.

But there is a clear distinction, in this respect, between tort and contract. 17 C. J. 756. For apparently good reasons, the rule as to certainty is much more liberal in a tort case. This is well expounded in the leading case of Allison v. Chandler, 11 Mich. 542, where it was said:

"There are some important considerations which tend to limit damages in an action upon contract, which have no application to those purely of tort. Contracts are made only by the mutual consent of the respective parties; and each party, for a consideration, thereby consents that the other shall have certain rights as against him, which he would not otherwise possess. In entering into the contract the parties are supposed to understand its legal effect, and, consequently, the limitations which the law, for the sake of certainty, has fixed for the recovery of damages for its breach. If not satisfied with the risk which these rules impose the parties may decline to enter into the contract, or may fix their own rule of damages when, in their nature, the amount must be uncertain. Hence, when suit is brought upon such contract, and it is found that the entire damages actually sustained cannot be recovered without a violation of such rules, the deficiency is a loss, the risk of which the party voluntarily assumed on entering into the contract, for the chance of benefit or advantage which the contract would have given him in case of performance. His position is one in which he has voluntarily contributed to place himself, and in which, but for his own consent, he could not have been placed by the wrongful act of the opposite party alone.

"Again, in the majority of cases upon contract, there is little difficulty from the nature of the subject, in finding a rule by which substantial compensation may be readily estimated; and it is only in those cases where this cannot be done, and where, from the nature of the stipulations, or the subject matter, the actual damages resulting from a breach, are more or less uncertain in their nature, or difficult to be shown with accuracy by the evidence, under any definite rule, that there can be any great failure of justice by adhering to such rule as will most nearly approximate the desired result. And it is precisely in these classes of cases that the parties have it in their power to protect themselves against any loss to arise from such uncertainty, by estimating their own damages in the contract itself, and providing for themselves the rules by which the amount shall be measured in case of a breach; and if they neglect this, they may be presumed to have assented to such damages as may be measured by the rules which the law, for the sake of certainty has adopted. * * *

"None of these several considerations have any bearing in an action purely of tort. The injured party has consented to enter into no relation with the wrongdoer by which any hazard of loss should be incurred; nor has he received any consideration, or chance of benefit or advantage, for the assumption of such hazard; nor has the wrongdoer given any consideration, nor assumed any risk, in consequence of any act or consent of his. The injured party has had no opportunity to protect himself by contract against any uncertainty in the estimate of damages; no act of his has contributed to the injury; he has yielded nothing by consent and, least of all, has he consented that the wrongdoer· might take or injure his property or deprive him of his rights, for such sum as, by the strict rules which the law has established for the measurement of damages in actions upon contract, he may be able to show, with certainty, he has sustained by such taking or injury. Especially would it be unjust to presume such consent, and to hold him to the recovery of such damages only as may be measured with certainty by fixed rules, when the case is one which, from its very nature, affords no elements of certainty by which the loss he has actually suffered can be shown with accuracy by any evidence of which the case is susceptible. * * *

"Since from the nature of the case, the damages cannot be estimated with certainty, and there is a risk of giving by one course of trial less, and by the other more than a fair compensation—to say nothing of justice—does not sound policy require that the risk should be thrown upon the wrongdoer instead of the injured party?"

The opinion from which we have so liberally quoted involved like our case of Palma v. Weinman, supra, damages for loss of profits because of eviction from a store building. The rule in the Palma Case rejects for uncertainty proof of damages against a wrongdoer for an injury not contemplated, and for which the injured party was in no wise responsible. We surely cannot require less certainty in the case at bar.; one in which the defendant agreed to a stipulation uncertain in itself, and for the breach of which the damages must be uncertain. An illustrative case, where the contract itself was uncertain, is Hart v. Georgia R. Co., 101 Ga. 188, 28 S. E. 637. But we need not, and do not hold that, because of the uncertainty of the stipulation, damages were not susceptible of proof. We do hold that any damages awarded upon this record would have been speculative and could not be sustained. Sedgwick on Damages § 170; Knowles v. Leggett, 7 Colo. App.

265, 43 P. 154; Sullivan v. McMillan, 26 Fla. 543, 8 So. 450; Findlay Brick Co. v. Am. Sewer Pipe Co., 18 Ga. App. 446, 89 S. E. 535; Baylies v. Bent, 185 Ill., App. 437; Mayer v. Mitchell, 59 Ill. App. 26; Louisville Bridge Co.v. L. & N. R. Co., 116 Ky. 258, 75 S. W. 285; Friedland v. McNeil, 33 Mich. 40; Hubbard Specialty Mfg. Co. v. Minneapolis Wood-Designing Co., 47 Minn. 393, 50 N. W. 349; Wittenberg v. Mollyneaux, 55 Neb. 429, 75 N. W. 835; Beck v. B. & O. R. Co., 233 Pa. 344, 82 A. 466; Fessler v. Love, 48 Pa. 407; Loder v. Jayne (C. C.) 142, F. 1010.

The lower court having reached the same result, though on different grounds, the judgment with respect to the shortage of fence is not erroneous.

[**10**] Plaintiffs complain that as the prevailing party they should have recovered costs. On the other hand defendant complains that the recoupment awarded cleared up its default, so that neither costs nor attorney's fees should have been awarded against it. It is to be noted, in this connection, that the recoupment allowed is greater than the principal and interest of the only note which according to its terms, was due at the time of commencement of suit.

With respect to costs, plaintiff's contention must be upheld.   Section 4282, Code of 1915, provides:

"For all civil actions or proceedings of any kind, the party prevailing shall recover his costs against the other party, except in those cases in which a different provision is made by law."

In re Marron & Wood, 22 N. M. 501, 165 P. 216, points out that this provision has been a part of our statute law since the Kearney Code; that it is the exact duplicate of the provision in Missouri, which, in turn, was no doubt copied from Massachussetts. In Smith v. Wenz, 187 Mass. 421, 73 N. E. 651, it was held:

"Where but one judgment is rendered in the action, the prevailing party is the one in whose favor that judgment is entered."

See, also, New Haven & Northampton v. Northampton, 102 Mass. 116.

[**11**] Under this rule there can be no question that plaintiffs prevail within the meaning of the statute. We have examined the cases cited by defendant, but they do not seem to be applicable. If the statute allowed discretion in the matter of awarding costs, defendant's argument that its default was cured by the recoupment might be tenable. Attorney's fees were allowed in accordance with the contract, and we can see no error therein.

Plaintiffs contend that the court erred in allowing interest at 6 per cent. on the sum recouped from August 11, 1917, the effective date of the contract, when delivery of the property was made and the notes given. They urge:

"But why should the defendant in error be allowed interest on something which he had never paid?. The defendant in error 'had never paid the $33,635. It was never out said amount, and why should it be allowed interest upon money it had never paid or parted with? If there was an actual shortage of 961 head of cattle on August 11, 1917, when said contract was consummated in the manner hereinbefore shown, the defendant in error had not been out any expense in caring for said 961 head, because they were not in existence, and he had not paid out any money on account of the purchase of cattle that were not in existence."

We are not impressed with the force of these arguments. Considering the essence of the transaction, on August 11, 1917, defendant had settled in full for the property purchased. He had paid $100,000 in cash and $125,000 in negotiable interest-bearing notes. This settlement of $225,000 included the consideration for 961 head of cattle which defendant never received and plaintiffs never delivered. It seems to us that in every sense material to this inquiry defendant had paid for the property. The recoupment is approximately 15 per cent. of the purchase price. Then $15,000 of the cash payment and $18,635 of the notes represented the consideration for the 961 head of cattle. Defendant paid the interest on all the notes accruing from

August 11, 1917, to October 1, 1919.   Fifteen per cent. of this interest payment was on account of the missing cattle.   The decree provides for a recovery by plaintiffs of the remaining $75,000 and the interest thereon from October 1, 1919, reduced only by the amount of the recoupment and its interest.   On plaintiffs' theory, defendant would be required to pay interest on $18,635 from August 11, 1917 to June 1, 1923, date of decree, and be out the use of $15,000 for 8 years or more, all without consideration. The decree of the court awarding interest on the recoupment serves to correct this situation and is clearly equitable.

If there is any equity in the argument that consideration should be given to the fact that defendant has been spared the expense of caring for 961 head of cattle, it cannot avail here.   There is no finding as to the amount of such expense, no error assigned in that respect, and the matter was apparently not brought to the attention of the trial court.

[12] In so far as plaintiffs base their objection on equitable grounds, it is clearly without merit, and is to be overruled.   A more difficult question arises, however, upon their contention that interest cannot be allowed on the recoupment because it was an unliquidated claim.   In considering this question, it is to be borne in mind that it is not interest in the ordinary sense which the decree allows. It is interest as damages, an essential component, as we have seen, of just compensation for defendant's loss.   Do the rules of law operate to forbid this means of restoring to defendant more than $2,500 of excess interest actually paid, of offsetting about the same amount of excess interest which the decree requires that he still pay, and of compensating him for the loss of the use of $15,000 excess principal, paid 8 years ago?

It is true it has often been said that interest cannot be recovered antedating the liquidation of the claim. In seeking the foundation and authority for this sup-

posed rule of law, we were struck with the force of the observation of Dodge, J., in Laycock v. Parker, 103 Wis. 161, 79 N. W. 327:

"The question of interest is one much more often passed upon than carefully considered by courts. It is usually presented only incidentally to much more important issues, and often decided one way or the other at the close of exhaustive investigation of the other questions, and with the perhaps unconscious feeling that it is not of sufficient magnitude to justify further serious labor. Again, the elements involved in determining the question are many of them so elastic in their application that cases may be rightly resolved in different ways without the distinction being apparent from the statement of them."

The distinction between liquidated and unliquidated demands is perhaps an important one; useful as a first consideration; determinative in some cases, but often not so without resort to further classification. Where a sum certain becomes due at a fixed time—an undoubted liquidated claim—it is generally considered that interest is recoverable as an element of damages, regardless of contract or statute. On the other hand, where the damages are wholly at large, as for assault and battery, slander, or personal injury—undoubtedly unliquidated—it is generally considered that interest as damages may not be recovered. So far, the distinction pointed out and relied upon operates successfully and is supported by the authorities, but, as remarked in Sedgwick on Damages, § 299:

"Between these two extreme cases the whole body of the law lies, and it will be found that in this middle ground the demands approach or depart from the type of a liquidated demand in different degrees."

The reason of the rule allowing interest as damages on liquidated claims is plain. It is essential to compensation, and compensation is the fundamental principle of damages. The reason generally given for refusing interest on unliquidated claims is that, where the amount is wholly unascertainable until verdict, neither party could have arrived at the amount necessary to satisfy the claim, and hence it cannot be said that there has been a wrongful detention. Where the damages

are wholly at large, it is also considered that the jury, having such latitude, has probably made allowance for all features of the case bearing upon just compensation, including the lapse of time. These are just objections to the allowance of interest on claims wholly at large, and those where the amount and date of accrual are unascertainable. They must prevail where the law can do no better.

The "unsatisfactory character of the test" is thus pointed out in Sedgwick on Damages, § 300:

"There is no reason why a person injured should have a smaller measure of recovery in one case than the other. There is no reason why the damages to be paid by the defendant should be mitigated or reduced by the circumstance that his tort or breach of contract was of such an aggravated or cunningly perfidious character as to make a liquidation of the claim against him difficult. On general principles, once admitted that interest is the natural fruit of money, it would seem that wherever a verdict liquidates a claim and fixes it as of a prior date, interest should follow from that date."

This distinguished author then proceeds to lay down the test for further classification as follows:

" * * * First is whether the demand is of such a nature that its exact pecuniary amount was either ascertained or ascertainable by simple computation, or by reference to generally recognized standards such as market price; second whether the time from which interest, if allowed, must run—that is, a time of definite default or tort-feasance—can be ascertained."

As to the second of these tests, no discussion is required. It is clear that, if defendant is to have interest by way of compensation, the date fixed by the trial judge is correct. As to the first of the tests, the leading case seems to be Van Rensselaer v. Jewett, 2 N. Y. 135, 51 Am. Dec. 275. This case, as well as the other New York cases and the earlier Wisconsin cases is reviewed in Laycock v. Parker, supra. Here is briefly traced the development of the law, both by enactment and by decision, from its ancient "abhorrence" and outlawry of interest, called "usury," through its forced recognition of it, and to the acceptance finally of the doctrine of interest as damages. It is there said:

" * * * The old reasons and principles have been departed from in deference to modern business methods and views of commercial equity and upon which the law has progressed in a steady development away from the early precedents Sedgwick on Dam. § 297."

In Bernhard v. Rochester German Ins. Co., 79 Conn. 388, 65 A. 134, 8 Ann. Cas. 298, it was said:

"Courts are more and more coming to recognize that a rule forbidding an allowance for interest upon unliquidated damages is one well calculated to defeat that purpose in many cases, and that no right reason exists for drawing an arbitrary distinction between liquidated and unliquidated damages. * * * The determination of whether or not interest is to be recognized as a proper element of damage, is one to be made in view of the demands of justice rather than through the application of any arbitrary rule."

Any considerable reference to the authorities would unduly extend this opinion. Suffice it to say that the old distinction between liquidated and unliquidated damages seems to be discredited by the weight of modern decisions and texts.

[13] In the case at bar there were two essentials to the determination before judgment of the amount necessary to satisfy the defendant's claim of recoupment— the number of cattle in question and their market value. Clearly the market value could have been easily ascertained. As to the number, it is true there was dispute and probable doubt, but, as said in Laycock v. Parker, supra:

"More difference of opinion as to amount is, however, no more reason to excuse him from interest than difference of opinion whether he legally ought to pay at all, which has never been held an excuse."

It does not follow from the dispute and doubt as to the number that it was not ascertainable, perhaps readily, from data in plaintiffs' possession, or at their command. Ordinarily one owning and selling and agreeing to deliver personal property would be presumed to know the quantity. It might be urged that the court's refusal to find that Col. Hopewell intended to perpetrate a fraud is equivalent to finding that he did not know the extent of the shortage, or even that there was

a shortage. Giving full weight to that suggestion, it does not follow that he had not the means or the data to enable him to ascertain at least the approximate number of cattle on the range. In any event, since the trial court allowed the interest, we should presume that he did so on the correct theory. The interest awarded was attacked in the lower court and attacked here only on the ground that the damages were unliquidated. This we find not a sound proposition. Counsel did not choose to attack the award on the ground that the damages were not readily ascertainable, and so that question is not involved.

Under the title ''Vendor and Vendee,'' it is laid down in Sutherland on Damages, § 671:

"As the paramount principle is to give compensation commensurate with the loss or injury the rule on the subject of warranties is always stated, when the case requires it, so as to include interest if the price has been paid. * * * "

And Sedgwick declares, section 313a:

"Where property is paid for in advance and the seller fails to deliver it, the purchaser recovers interest on the value from the time it should have been delivered. And so in case of any failure to deliver property."

These principles seem quite applicable here and are well supported. The exact procedure followed in this case finds authority in Sedgwick on Damages, § 314b, thus stated:

"If one claim is liquidated in amount, interest will run on that claim, though the counter claim is unliquidated; but in such a case interest is allowed on the balance only, from the time the counterclaim accrued, or, what amounts to the same thing, interest is allowed on both sides of the account."

There are numerous decisions to the effect that, while equity generally looks to the law for the rule of damages, it will not refuse interest on unliquidated claims where justice requires its allowance. We do not base our decision on that ground, because satisfied that the present decree is to be sustained by the better rules recognized at law. The doctrine of damages in the nature of interest on unliquidated demands is not unknown to the law of this state.

State T. & S Bk. et al. v. Hermosa L. & C. Co. 30 N. M. 566

"The jury on the trial of any issue or inquisition of damages may, if they shall think fit, give damages in the nature of interest, over and above the value of the goods at the time of the conversion or seizure."    Section 4208, Code of 1915.

This statute is not invoked as legislative support of this particular decree; but there is no more inherent difficulty in ascertaining, in advance of the verdict, the amount of damages for a conversion than for a breach of contract to deliver.

On these considerations we are satisfied with the correctness of the decree as to interest, at least as against the objections urged by the plaintiffs here and in the court below.

Finding no error in the record, except with respect to costs, the judgment will be reversed, and the cause remanded, with direction to tax the costs in the lower court against the defendant, and to modify; the decree by including such costs in the amount for the satisfaction of which the mortgaged property may be sold. Plaintiffs will recover their costs in this court, and it is so ordered.

PARKER, C. J. and BICKLEY, J., concur.